# PRESS-ENTERPRISE CO. *v.* SUPERIOR COURT OF CALIFORNIA, RIVERSIDE COUNTY

No. 82–556.   Argued October 12, 1983—Decided January 18, 1984

*James D. Ward* argued the cause for petitioner. With him on the briefs was *John A. Boyd.*

*Glenn Robert Salter* argued the cause for respondent. With him on the brief were *Gerald J. Geerlings* and *Joyce Ellen Manulis Reikes.*\*

---

*Briefs of *amici curiae* urging reversal were filed for the Society of Professional Journalists, Sigma Delta Chi, et al. by *Bruce W. Sanford, W. Terry Maguire, Pamela J. Riley, Richard M. Schmidt, Jr., Donald F. Luke, Robert C. Lobdell, Robert S. Warren, Erwin G. Krasnow, Mark L. Tuft,* and *Boisfeuillet Jones, Jr.;* and for USA Today et al. by *John*

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the guarantees of open public proceedings in criminal trials cover proceedings for the *voir dire* examination of potential jurors.

I

Albert Greenwood Brown, Jr., was tried and convicted of the rape and murder of a teenage girl, and sentenced to death in California Superior Court. Before the *voir dire* examination of prospective jurors began, petitioner, Press-Enterprise Co., moved that the *voir dire* be open to the public and the press. Petitioner contended that the public had an absolute right to attend the trial, and asserted that the trial commenced with the *voir dire* proceedings. The State opposed petitioner's motion, arguing that if the press were present, juror responses would lack the candor necessary to assure a fair trial.

The trial judge agreed and permitted petitioner to attend only the "general voir dire." He stated that counsel would conduct the "individual voir dire with regard to death qualifications and any other special areas that counsel may feel some problem with regard to . . . in private. . . ." App. 93. The *voir dire* consumed *six weeks* and all but approximately three days was closed to the public.

After the jury was empaneled, petitioner moved the trial court to release a complete transcript of the *voir dire* proceedings. At oral argument on the motion, the trial judge

E. Carne, Judith R. Epstein, Alice Neff Lucan, Edward J. McIntyre, Douglas T. Foster, and Michael B. Dorais.

A brief of *amicus curiae* urging affirmance was filed by *Joseph Peter Myers, pro se.*

Briefs of *amici curiae* were filed for the California State Public Defender by *Quin Denvir, Michael G. Millman,* and *Joseph Levine;* and for the State of California by *John K. Van De Kamp,* Attorney General, *Harley D. Mayfield,* Assistant Attorney General, and *Keith I. Motley,* Deputy Attorney General.

described the responses of prospective jurors at their *voir dire:*

> "Most of them are of little moment. There are a few, however, in which some personal problems were discussed which could be somewhat sensitive as far as publication of those particular individuals' situations are concerned." *Id.,* at 103.

Counsel for Brown argued that release of the transcript would violate the jurors' right of privacy. The prosecutor agreed, adding that the prospective jurors had answered questions under an "implied promise of confidentiality." *Id.,* at 111. The court denied petitioner's motion, concluding as follows:

> "I agree with much of what defense counsel and People's counsel have said and I also, regardless of the public's right to know, I also feel that's rather difficult that by a person performing their civic duty as a prospective juror putting their private information as open to the public which I just think there is certain areas that the right of privacy should prevail and a right to a fair trial should prevail and the right of the people to know, I think, should have some limitations and, so, at this stage, the motion to open up . . . the individual sequestered voir dire proceedings is denied without prejudice." *Id.,* at 121.

After Brown had been convicted and sentenced to death, petitioner again applied for release of the transcript. In denying this application, the judge stated:

> "The jurors were questioned in private relating to past experiences, and while most of the information is dull and boring, some of the jurors had some special experiences in sensitive areas that do not appear to be appropriate for public discussion." *Id.,* at 39.

Petitioner then sought in the California Court of Appeal a writ of mandate to compel the Superior Court to release the

transcript and vacate the order closing the *voir dire* proceedings. The petition was denied. The California Supreme Court denied petitioner's request for a hearing. We granted certiorari. 459 U. S. 1169 (1983). We reverse.

## II

The trial of a criminal case places the factfinding function in a jury of 12 unless by statute or consent the jury is fixed at a lesser number or a jury is waived. The process of juror selection is itself a matter of importance, not simply to the adversaries but to the criminal justice system. In *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555, 569 (1980), the plurality opinion summarized the evolution of the criminal trial as we know it today and concluded that "at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open." A review of the historical evidence is also helpful for present purposes. It reveals that, since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown.

### A

The roots of open trials reach back to the days before the Norman Conquest when cases in England were brought before "moots," a town meeting kind of body such as the local court of the hundred or the county court.[1] Attendance was virtually compulsory on the part of the freemen of the community, who represented the "patria," or the "country," in rendering judgment. The public aspect thus was "almost a necessary incident of jury trials, since the presence of a jury . . . already insured the presence of a large part of the public."[2]

---

[1] Pollock, English Law Before the Norman Conquest, 1 Select Essays in Anglo-American Legal History 88, 89 (1907).

[2] Radin, The Right to a Public Trial, 6 Temp. L. Q. 381, 388 (1932); see 3 W. Blackstone, Commentaries *349.

As the jury system evolved in the years after the Norman Conquest, and the jury came to be but a small segment representing the community, the obligation of all freemen to attend criminal trials was relaxed; however, the public character of the proceedings, including jury selection, remained unchanged. Later, during the 14th and 15th centuries, the jury became an impartial trier of facts, owing in large part to a development in that period, allowing challenges.[3] 1 W. Holdsworth, History of English Law 332, 335 (7th ed. 1956). Since then, the accused has generally enjoyed the right to challenge jurors in open court at the outset of the trial.[4]

Although there appear to be few contemporary accounts of the process of jury selection of that day,[5] one early record written in 1565 places the trial "[i]n the towne house, or in some open or common place." T. Smith, De Republica

---

[3] In 1352, a statute was enacted to permit challenges to petit jurors on the ground of their participation as "indicators" on the presenting jury. 25 Edw. 3, Stat. 5, ch. 3; see T. Plucknett, A Concise History of Common Law 109 (1929). Objections had always been allowed on grounds of personal hostility. 1 W. Holdsworth, History of English Law 332, 324–325 (7th ed. 1956).

[4] In *Peter Cook's Trial,* 4 Har. St. Tr. 737, 738–740 (O. B. 1696), the accused himself attempted to pose questions directly to jurors in order to sustain challenges. "You may ask upon a Voyer Dire, whether he [the juror] have any Interest in the Cause; nor shall we deny you Liberty to ask whether he be fitly qualified, according to Law by having a Freehold of sufficient Value." *Id.,* at 748. And in *Harrison's Trial,* 2 Har. St. Tr. 308, 313 (O. B. 1660), the reporter remarks that the defendant's persistence in challenging jurors provoked laughter in the courtroom: *"Here the People seemed to laugh,"* he writes, upon the defendant's 10th peremptory challenge.

[5] As noted in *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S. 555, 565, n. 5 (1980), it is not surprising that there is little in the way of contemporary record of the openness of those early trials. Historians have commented that early Anglo-Saxon laws "deal rather with the novel and uncertain, than with the normal and undoubted rules of law. . . . Why trouble to record that which every village elder knows?" E. Jenks, A Short History of English Law 3–4 (2d ed. 1922).

Anglorum 96 (Alston ed. 1906). Smith explained that "there is nothing put in writing but the enditement":

> "All the rest is doone openlie in the presence of the Judges, the Justices, the enquest, the prisoner, *and so many as will or can come so neare as to heare it,* and all depositions and witnesses given aloude, *that all men may heare from the mouth of the depositors and witnesses what is saide."* *Id.,* at 101 (emphasis added).

If we accept this account it appears that beginning in the 16th century, jurors were selected in public.

As the trial began, the judge and the accused were present. Before calling jurors, the judge "telleth the cause of their comming, *and* [thereby] *giveth a good lesson to the people."* *Id.,* at 96–97 (emphasis added). The indictment was then read; if the accused pleaded not guilty, the jurors were called forward, one by one, at which time the defendant was allowed to make his challenges. *Id.,* at 98. Smith makes clear that the entire trial proceeded "openly, that not only the xii [12 jurors], but the Judges, the parties *and as many* [others] *as be present may heare."* *Id.,* at 79 (emphasis added).

This open process gave assurance to those not attending trials that others were able to observe the proceedings and enhanced public confidence. The presence of bystanders served yet another purpose according to Blackstone. If challenges kept a sufficient number of qualified jurors from appearing at the trial, "either party may pray a *tales."* 3 W. Blackstone Commentaries *364; see also M. Hale, The History of the Common Law of England 342 (6th ed. 1820). A "tales" was the balance necessary to supply the deficiency.[6]

---

[6] By the statute 35 Hen. 8, ch. 6 (1543), the judge was empowered to award a *"tales de circumstantibus,* of persons present in court, to be joined to the other jurors to try the cause." 3 W. Blackstone, *supra,* at *365. If the judge issued such a writ, the sheriff brought forward "talesmen" from

The presumptive openness of the jury selection process in England, not surprisingly, carried over into proceedings in colonial America. For example, several accounts noted the need for talesmen at the trials of Thomas Preston and William Wemms, two of the British soldiers who were charged with murder after the so-called Boston Massacre in 1770.[7] Public jury selection thus was the common practice in America when the Constitution was adopted.

## B

For present purposes, how we allocate the "right" to openness as between the accused and the public, or whether we view it as a component inherent in the system benefiting both, is not crucial. No right ranks higher than the right of the accused to a fair trial. But the primacy of the accused's right is difficult to separate from the right of everyone in the community to attend the *voir dire* which promotes fairness.

The open trial thus plays as important a role in the administration of justice today as it did for centuries before our separation from England. The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system. *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S., at 569–571.

This openness has what is sometimes described as a "community therapeutic value." *Id.*, at 570. Criminal acts, es-

---

among the bystanders in the courtroom. These talesmen were then subject to the same challenges as the others.

[7] 3 Legal Papers of John Adams 17, nn. 51, 52, 18 (1965) (Adams) (quoting William Palfrey to John Wilkes, Oct. 1770, in Elsey, John Wilkes and William Palfrey, 34 Col. Soc. Mass., *Pubns.* 411, 423–425 (1943)); 3 Adams 49, n. 9 (quoting Acting Governor Thomas Hutchinson in Additions to Hutchinson's History 32 (C. Mayo ed.)); 3 Adams 100.

pecially violent crimes, often provoke public concern, even outrage and hostility; this in turn generates a community urge to retaliate and desire to have justice done. See T. Reik, The Compulsion to Confess 288–295, 408 (1959). Whether this is viewed as retribution or otherwise is irrelevant. When the public is aware that the law is being enforced and the criminal justice system is functioning, an outlet is provided for these understandable reactions and emotions. Proceedings held in secret would deny this outlet and frustrate the broad public interest; by contrast, public proceedings vindicate the concerns of the victims and the community in knowing that offenders are being brought to account for their criminal conduct by jurors fairly and openly selected. See United States v. Hasting, 461 U. S. 499, 507 (1983); Morris v. Slappy, 461 U. S. 1, 14–15 (1983).

"People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." Richmond Newspapers, supra, at 572. Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness.[8] In Globe Newspaper Co. v. Superior Court, 457 U. S. 596 (1982), we stated:

> "[T]he circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty

---

[8] That for certain purposes, e. g., double jeopardy, a trial begins when the first witness, Wade v. Hunter, 336 U. S. 684, 688 (1949), or the jurors, Downum v. United States, 372 U. S. 734 (1963), are sworn does not bear on the question presented here. The rules of attachment of jeopardy represent the broad perception that the Government's action has reached the point where its power to retrace its steps must be checked by the "countervailing interests of the individual protected by the double jeopardy clause of the fifth amendment." United States v. Velazquez, 490 F. 2d 29, 34 (CA2 1973); accord, United States v. Jorn, 400 U. S. 470, 480 (1971). By contrast, the question we address—whether the voir dire process must be open—focuses on First, rather than Fifth, Amendment values and the historical backdrop against which the First Amendment was enacted.

one. Where . . . the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Id.*, at 606–607.

The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered. We now turn to whether the presumption of openness has been rebutted in this case.

## III

Although three days of *voir dire* in this case were open to the public, *six weeks* of the proceedings were closed, and media requests for the transcript were denied.[9] The Superior Court asserted two interests in support of its closure order and orders denying a transcript: the right of the defendant to a fair trial, and the right to privacy of the prospective jurors, for any whose "special experiences in sensitive areas . . . do not appear to be appropriate for public discussion." *Supra*, at 504. Of course the right of an accused to fundamental fairness in the jury selection process is a compelling interest. But the California court's conclusion that Sixth Amendment and privacy interests were sufficient to warrant prolonged closure was unsupported by findings

---

[9] We cannot fail to observe that a *voir dire* process of such length, in and of itself, undermines public confidence in the courts and the legal profession. The process is to ensure a fair impartial jury, not a favorable one. Judges, not advocates, must control that process to make sure privileges are not so abused. Properly conducted it is inconceivable that the process could extend over such a period. We note, however, that in response to questions counsel stated that it is not unknown in California courts for jury selection to extend six months.

showing that an open proceeding in fact threatened those interests;[10] hence it is not possible to conclude that closure was warranted.[11] Even with findings adequate to support closure, the trial court's orders denying access to *voir dire* testimony failed to consider whether alternatives were available to protect the interests of the prospective jurors that the trial court's orders sought to guard. Absent consideration of alternatives to closure, the trial court could not constitutionally close the *voir dire*.

The jury selection process may, in some circumstances, give rise to a compelling interest of a prospective juror when interrogation touches on deeply personal matters that person has legitimate reasons for keeping out of the public domain.

---

[10] We have previously noted that in some limited circumstances, closure may be warranted. Thus a trial judge may, "in the interest of the fair administration of justice, impose reasonable limitations on access to a trial. '[T]he question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge . . . the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places.'" *Richmond Newspapers*, 448 U. S., at 581–582, n. 18 (quoting *Cox* v. *New Hampshire*, 312 U. S. 569, 574 (1941)).

[11] Petitioner contends that respondent's closure order was based on the requirement in *Hovey* v. *Superior Court*, 28 Cal. 3d 1, 80, 616 P. 2d 1301 (1980), that jurors answer *voir dire* questions concerning juror death qualifications "outside the presence of . . . fellow venirepersons." *Id.*, at 81, 616 P. 2d, at 1354. The docket sheet merely states, however, that petitioner's motion to be admitted to jury *voir dire* "is denied and granted in part, as stated on the record." The transcript of hearing on the motion is unenlightening on this score. See App. 93. Thus, it is not clear that the judge's ruling was based on *Hovey*.

Assuming that *Hovey* was the basis for the trial court's order, it is unclear that the interests *Hovey* sought to protect could have justified respondent's closure order. In *Hovey*, the California Supreme Court focused on studies that indicated that jurors were prejudiced by the answers of other jurors during *voir dire*. There was no indication that the presence of the public or press affected jurors. The California Supreme Court in fact stated that its decision would not "in any way affect the open nature of a trial." 28 Cal. 3d, at 80–81, 616 P. 2d, at 1354.

The trial involved testimony concerning an alleged rape of a teenage girl. Some questions may have been appropriate to prospective jurors that would give rise to legitimate privacy interests of those persons. For example a prospective juror might privately inform the judge that she, or a member of her family, had been raped but had declined to seek prosecution because of the embarrassment and emotional trauma from the very disclosure of the episode. The privacy interests of such a prospective juror must be balanced against the historic values we have discussed and the need for openness of the process.

To preserve fairness and at the same time protect legitimate privacy, a trial judge must at all times maintain control of the process of jury selection and should inform the array of prospective jurors, once the general nature of sensitive questions is made known to them, that those individuals believing public questioning will prove damaging because of embarrassment, may properly request an opportunity to present the problem to the judge *in camera* but with counsel present and on the record.

By requiring the prospective juror to make an affirmative request, the trial judge can ensure that there is in fact a valid basis for a belief that disclosure infringes a significant interest in privacy. This process will minimize the risk of unnecessary closure. The exercise of sound discretion by the court may lead to excusing such a person from jury service. When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests. Even then a valid privacy right may rise to a level that part of the transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment.

The judge at this trial closed an incredible *six* weeks of *voir dire* without considering alternatives to closure. Later the court declined to release a transcript of the *voir dire* even while stating that "most of the information" in the transcript was "dull and boring." *Supra*, at 504. Those parts of the transcript reasonably entitled to privacy could have been sealed without such a sweeping order; a trial judge should explain why the material is entitled to privacy.

Assuming that some jurors had protectible privacy interests in some of their answers, the trial judge provided no explanation as to why his broad order denying access to information at the *voir dire* was not limited to information that was actually sensitive and deserving of privacy protection. Nor did he consider whether he could disclose the substance of the sensitive answers while preserving the anonymity of the jurors involved.

Thus not only was there a failure to articulate findings with the requisite specificity but there was also a failure to consider alternatives to closure and to total suppression of the transcript. The trial judge should seal only such parts of the transcript as necessary to preserve the anonymity of the individuals sought to be protected.

## IV

The judgment of the Court of Appeal is vacated, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, concurring.

I agree that in this case the trial judge erred in closing the *voir dire* proceeding and in refusing to release a transcript of that proceeding without appropriate specific findings that nondisclosure was necessitated by a compelling governmental interest and was narrowly tailored to serve that interest. I write separately to emphasize my understanding

that the Court does not decide, nor does this case require it to address, the asserted "right to privacy of the prospective jurors." *Ante*, at 510.

Certainly, a juror has a valid interest in not being required to disclose to all the world highly personal or embarrassing information simply because he is called to do his public duty. We need not decide, however, whether a juror, called upon to answer questions posed to him in court during *voir dire*, has a legitimate expectation, rising to the status of a privacy right, that he will not have to answer those questions. See *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 458 (1977); *Whalen* v. *Roe*, 429 U. S. 589, 599 (1977).[1]

---

[1] As to most of the information sought during *voir dire*, it is difficult to believe that when a prospective juror receives notice that he is called to serve, he has an expectation, either actual or reasonable, that what he says in court will be kept private. Despite the fact that a juror does not put himself voluntarily into the public eye, a trial is a public event. See *Craig* v. *Harney*, 331 U. S. 367, 374 (1947). See also *Globe Newspaper Co.* v. *Superior Court*, 457 U. S. 596 (1982); *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555 (1980); *Gannett Co.* v. *DePasquale*, 443 U. S. 368 (1979). And, as the Court makes clear today, *voir dire*, like the trial itself, is presumptively a public proceeding. The historical evidence indicates that *voir dire* has been conducted in public and most prospective jurors are aware that they will be asked questions during *voir dire* to determine whether they can judge impartially.

On other hand, courts have exercised their discretion to prevent unnecessarily intrusive *voir dire* questions. See *Sprouce* v. *Commonwealth*, 2 Va. Cas. 375 (1823) ("[In England] . . . the juror is not obliged to answer any question tending to fix infamy, or disgrace, on him . . ."); *Ryder* v. *State*, 100 Ga. 528, 535, 28 S. E. 246, 248 (1897) ("Certainly, neither the court nor counsel should ask any question which would involve a breach of the juror's privilege to refuse to answer on the ground that so doing would tend to incriminate, or otherwise disgrace, him"). More recent cases have relied, however, not on juror privacy, but on the trial judge's discretion to limit *voir dire* to protect juror safety or to prevent irrelevant questioning. See, *e. g.*, *United States* v. *Barnes*, 604 F. 2d 121, 140 (CA2 1979), cert. denied, 446 U. S. 907 (1980); *United States* v. *Taylor*, 562 F. 2d 1345, 1355 (CA2), cert. denied *sub nom. Salley* v. *United States*, 432 U. S. 909 (1977).

I am concerned that recognition of a juror's privacy "right" would unnecessarily complicate the lives of trial judges attempting to conduct a *voir dire* proceeding. Could a juror who disagreed with a trial judge's determination that he had no legitimate expectation of privacy in certain information refuse to answer without a promise of confidentiality until some superior tribunal declared his expectation unreasonable? Could a juror ever refuse to answer a highly personal, but relevant, question, on the ground that his privacy right outweighed the defendant's need to know? I pose these questions only to emphasize that we should not assume the existence of a juror's privacy right without considering carefully the implications of that assumption.

Nor do we need to rely on a privacy right to decide this case. No juror is now before the Court seeking to vindicate that right. Even assuming the existence of a juror's privacy right, the trial court erred in failing to articulate specific findings justifying the closure of the *voir dire* and the refusal to release the transcript. More important, as the trial court recognized, the defendant has an interest in protecting juror privacy in order to encourage honest answers to the *voir dire* questions.[2] The State has a similar interest in protecting juror privacy, even after the trial—to encourage juror honesty in the future—that almost always will be coextensive with the juror's own privacy interest. Thus, there is no need to determine whether the juror has a separate assertable constitutional right to prevent disclosure of his an-

---

[2] In closing the *voir dire* and in refusing to release the transcript, the trial court relied on both the defendant's right to a fair trial and a juror's right to privacy. It did not make clear whether it interpreted the California Supreme Court's decision in *Hovey* v. *Superior Court*, 28 Cal. 3d 1, 616 P. 2d 1301 (1980), to require closure, see *ante*, at 511, n. 11, or whether it concluded that the defendant had an additional interest in protecting juror privacy to encourage juror honesty. In any event, it concluded that the interests of the jurors and the defendant were consistent and that both required the protection of juror privacy.

swers during *voir dire*. His interest in this case, and in most cases, can be fully protected through the interests of the defendant and the State in encouraging his full cooperation.

With these qualifications, I join the Court's opinion. I agree that the privacy interest of a juror is a legitimate consideration to be weighed by a trial court in determining whether the public may be denied access to portions of a *voir dire* proceeding or to a transcript of that proceeding. I put off to another day consideration of whether and under what conditions that interest rises to the level of a constitutional right.

JUSTICE STEVENS, concurring.

The constitutional protection for the right of access that the Court upholds today is found in the First Amendment,[1] rather than the public trial provision of the Sixth.[2] If the defendant had advanced a claim that his Sixth Amendment right to a public trial was violated by the closure of the *voir dire*, it would be important to determine whether the selection of the jury was a part of the "trial" within the meaning of that Amendment. But the distinction between trials and other official proceedings is not necessarily dispositive, or even important, in evaluating the First Amendment issues. Nor is our holding premised simply on our view as to how a

---

[1] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

It is, of course, well settled that the Fourteenth Amendment makes this provision applicable to the abridgment of speech by the States, including state judges. See, *e. g.*, *Nebraska Press Assn. v. Stuart*, 427 U. S. 539 (1976).

[2] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." It was, of course, this Amendment that was construed in *Gannett Co. v. DePasquale*, 443 U. S. 368 (1979), a case holding that the defendant's right to a public trial cannot be asserted vicariously by persons who are not parties to the proceeding.

criminal trial is most efficaciously conducted. For the question the Court decides today—"whether the *voir dire* process must be open—focuses on First . . . Amendment values and the historical backdrop against which the First Amendment was enacted." *Ante,* at 509, n. 8.

The focus commanded by the First Amendment makes it appropriate to emphasize the fact that the underpinning of our holding today is not simply the interest in effective judicial administration; the First Amendment's concerns are much broader. The "common core purpose of assuring freedom of communication on matters relating to the functioning of government," *Richmond Newspapers, Inc.* v. *Virginia,* 448 U. S. 555, 575 (1980) (plurality opinion), that underlies the decision of cases of this kind provides protection to all members of the public "from abridgment of their rights of access to information about the operation of their government, including the Judicial Branch." *Id.,* at 584 (STEVENS, J., concurring). See also *id.,* at 587–588 (BRENNAN, J., concurring in judgment). As JUSTICE POWELL has written:

> "What is at stake here is the societal function of the First Amendment in preserving free public discussion of governmental affairs. No aspect of that constitutional guarantee is more rightly treasured than its protection of the ability of our people through free and open debate to consider and resolve their own destiny." *Saxbe* v. *Washington Post Co.,* 417 U. S. 843, 862 (1974) (dissenting opinion).[3]

This principle was endorsed by the Court in *Globe Newspaper Co.* v. *Superior Court,* 457 U. S. 596 (1982).

> "Underlying the First Amendment right of access to criminal trials is the common understanding that 'a major purpose of that Amendment was to protect the free dis-

---

[3] It is worthy of note that the orderly development of First Amendment doctrine foreshadowed by JUSTICE POWELL's opinion in *Saxbe* almost certainly would have been delayed if *Gannett* had not been decided as it was.

cussion of governmental affairs.' *Mills* v. *Alabama*, 384 U. S. 214, 218 (1966). By offering such protection, the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Id.*, at 604.[4]

It follows that a claim to access cannot succeed unless access makes a positive contribution to this process of self-governance. Here, public access cannot help but improve public understanding of the *voir dire* process, thereby enabling critical examination of its workings to take place. It is therefore, I believe, entirely appropriate for the Court to identify the public interest in avoiding the kind of lengthy *voir dire* proceeding that is at issue in this case, *ante*, at 510, n. 9. Surely such proceedings should not be hidden from public view.[5]

---

[4] See also *Houchins* v. *KQED, Inc.*, 438 U. S. 1, 30–32 (1978) (STEVENS, J., dissenting) (footnotes omitted):

"The preservation of a full and free flow of information to the general public has long been recognized as a core objective of the First Amendment to the Constitution. . . .

"In addition to safeguarding the right of one individual to receive what another elects to communicate, the First Amendment serves an essential societal function. Our system of self-government assumes the existence of an informed citizenry. As Madison wrote:

"'A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy, or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.' 9 Writings of James Madison 103 (G. Hunt ed. 1910).

"It is not sufficient, therefore, that the channels of communication be free of governmental restraints. Without some protection for the acquisition of information about the operation of public institutions such as prisons by the public at large, the process of self-governance contemplated by the Framers would be stripped of its substance."

[5] Of course, if this were a Sixth Amendment case, rather than a First Amendment case, and if the defendant had no objection to closure, the length of the *voir dire* would be irrelevant. Such is not the case under the rationale for today's decision.

The fact that this is a First Amendment case does not, of course, mean that the public's right of access is unlimited. Indeed, in other contexts in which the right of access has been implicitly endorsed, the Court has made this plain.[6] As the Court recognizes, the privacy interests of jurors may in some circumstances provide a basis for some limitation on the public's access to *voir dire*. *Ante*, at 511–513. See also *ante*, at 515–516 (BLACKMUN, J., concurring). The First Amendment source of the right of access to the *voir dire* examination should not preclude frank recognition of the need to examine the content of the censored communication in determining whether, and to what extent, it may remain private. When the process of drawing lines between what must be open and what may be closed begins, it will be necessary to identify at least some of the limits by reference to the subject matter of certain questions that arguably may probe into areas of privacy that are worthy of protection. Since that function can safely be performed without compromising the First Amendment's mission of securing meaningful public control over the process of governance, this form of regulation is not an abridgment of any First Amendment right. In this context, as in others, "a line may be drawn on the basis of content without violating the goverment's paramount obligation of neutrality in its regulation of protected communication." *Young* v. *American Mini Theaters, Inc.*, 427 U. S. 50, 70 (1976) (plurality opinion).[7]

---

[6] In *Zemel* v. *Rusk*, 381 U. S. 1 (1965), the Court said: "The right to speak and publish does not carry with it the *unrestrained* right to gather information." *Id.*, at 17 (emphasis supplied). In *Branzburg* v. *Hayes*, 408 U. S. 665 (1972), after rejecting any suggestion "that news gathering does not qualify for First Amendment protection," *id.*, at 681, the Court held that the protection did not extend to a reporter's refusal to testify before a grand jury, at least under the facts of that case.

[7] See generally Farber, Content Regulation and the First Amendment: A Revisionist View, 68 Geo. L. J. 727 (1980); Redish, The Content Distinction in First Amendment Analysis, 34 Stan. L. Rev. 113 (1981); Schauer, Categories and the First Amendment: A Play in Three Acts, 34 Vand. L. Rev. 265, 282–296 (1981); Shiffrin, Defamatory Non-Media Speech and

In the case before us, as the Court correctly explains, there can be no doubt that the trial court applied an impermissibly broad rule of secrecy. Accordingly, I join the opinion of the Court.

JUSTICE MARSHALL, concurring in the judgment.

I agree with the result reached by the Court but write separately to stress that the constitutional rights of the public and press to access to all aspects of criminal trials are not diminished in cases in which "deeply personal matters" are likely to be elicited in *voir dire* proceedings. *Ante*, at 511. Indeed, the policies underlying those rights, see *Richmond Newspapers, Inc.* v. *Virginia*, 448 U. S. 555, 572–573 (1980) (plurality opinion); *id.*, at 593–597 (BRENNAN, J., concurring in judgment), are most severely jeopardized when courts conceal from the public sensitive information that bears upon the ability of jurors impartially to weigh the evidence presented to them. Cf. *Globe Newspaper Co.* v. *Superior Court*, 457 U. S. 596, 606 (1982) ("Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process . . ."). Therefore, prior to issuing a closure order, a trial court should be obliged to show that the order in question constitutes *the least restrictive means available* for protecting compelling state interests. In those cases where a closure order is imposed, the constitutionally preferable method for reconciling the First Amendment interests of the public and the press with the legitimate privacy interests of jurors and the interests of defendants in fair trials is to redact transcripts in such a way as to preserve the anonymity of jurors while disclosing the substance of their responses. *Ante*, at 513. Only in the most extraordinary

First Amendment Methodology, 25 UCLA L. Rev. 915, 942–963 (1978); Stephan, The First Amendment and Content Discrimination, 68 Va. L. Rev. 203 (1982); Note, Content Regulation and the Dimensions of Free Expression, 96 Harv. L. Rev. 1854 (1983).

circumstances can the substance of a juror's response to questioning at *voir dire* be permanently excluded from the salutary scrutiny of the public and the press.

Also, I feel compelled to note my strong disagreement with the Court's gratuitous comments concerning the length of *voir dire* proceedings in this and other cases. The Court's opinion states:

> "We cannot fail to observe that a *voir dire* process of such length [six weeks], in and of itself, undermines public confidence in the courts and the legal profession. The process is to ensure a fair impartial jury, not a favorable one. Judges, not advocates, must control that process to make sure privileges are not so abused. Properly conducted it is inconceivable that the process could extend over such a period. We note, however, that in response to questions counsel stated that it is not unknown in California courts for jury selection to extend six months." *Ante*, at 510, n. 9.

The question whether the *voir dire* proceedings in this case extended for too long a period is not before this Court. Not surprisingly, therefore, we know few of the facts that would be required to venture a confident ruling on that question. Some of the circumstances of which we are aware, however, cast considerable doubt on the majority's judgment. Albert Greenwood Brown, Jr., was accused of an interracial sexual attack and murder.[1] Given the history and continuing legacy of racism in our country, that fact alone should suggest that a greater than usual amount of inquiry may have been needed in order to obtain a fair and impartial jury in this

---

[1] The criminal trial around which this suit revolves was one in which "the most serious and emotional of issues were presented—the rape and strangulation killing of a fifteen year old white schoolgirl on her way to school, by a black man twenty-six years of age, with a prior conviction of forcible rape on an adolescent caucasian girl." Brief for Joseph Peter Myers (trial counsel for Albert Greenwood Brown, Jr.) as *Amicus Curiae* 2.

case. I find it not at all "inconceivable" that the *voir dire* process could have legitimately extended over six weeks.

Similarly, in the absence of facts not presently available to the Court, it is wrong to assume, as does the majority opinion, that a *voir dire* proceeding as elaborate and time-consuming as that which occurred in this case "in and of itself undermines public confidence in the courts and the legal profession." *Ibid.* After all, this was a *capital* case involving an interracial sexual attack that was bound to arouse a heightened emotional response from the affected community. In a situation of this sort, the public's response to the use of unusually elaborate procedures to protect the rights of the accused might well be, not lessened confidence in the courts, but rather heightened respect for the judiciary's unshakeable commitment to the ideal of due process even for persons accused of the most serious of crimes.[2]

Furthermore, in the absence of a claim that the length of *voir dire* proceedings violates federal law, this Court strays beyond its proper role when it lectures state courts on how best to structure such proceedings. We simply lack the authority to forbid state courts to devote what we might consider an inordinate amount of time to ensuring that a jury is unbiased.

For the foregoing reasons, I agree with the judgment but cannot join the opinion of the Court.

---

[2] It is unlikely that there exists a public consensus regarding the proper contours of *voir dire* proceedings. Certainly there is a lack of consensus within the legal community. See, *e. g., Ham* v. *South Carolina,* 409 U. S. 524 (1973). See also Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan. L. Rev. 545 (1975) (limiting *voir dire* examination undercuts the ability of litigants to utilize fully the right to a jury trial and works to the relative disadvantage of poor litigants who lack the resources to use other means to gather information about potential jurors).