**CALIFORNIA FIRST AMENDMENT CO-ALITION and Society of Professional Journalists, Northern California Chapter, Plaintiffs,**

v.

**Arthur CALDERON, Warden of San Quentin State Prison and James H. Gomez, Director of the California Department of Corrections, Defendants.**

**No. C–96–1291–VRW.**

United States District Court, N.D. California.

Feb. 28, 1997.

884

Alan L. Schlosser, Kelli Evans, American Civil Liberties Union, Foundation of Northern CA Inc., San Francisco, CA, Jeffrey S. Ross, Michael J. Kass, Jill Hersh, Friedman Ross & Hersh, P.C., San Francisco, CA, David M. Fried, Law Office of David M. Fried, San Francisco, CA, Lynne S. Coffin, San Francisco, CA, for California First Amendment Coalition, Society of Professional Journalists, Northern California Chapter.

Karl S. Mayer, CA State Attorney General's Office, San Francisco, CA, for Arthur Calderon, James Gomez.

## ORDER

WALKER, District Judge.

On February 23, 1996, California executed William Bonin. It was the state's first execution performed by lethal injection. On that occasion, witnesses were allowed to enter the observation room adjoining the execution chamber only after the condemned had been strapped to the gurney and the intravenous ("IV") tubes had been inserted into his arms. The witnesses did not hear the execution order. After several minutes in the observation room, the witnesses were told that the prisoner was dead.

Plaintiffs brought this suit seeking to enjoin prison officials from imposing on witnesses to future executions (including representatives of the media) the limitations that were imposed at the Bonin execution. Plaintiffs predicate their claim for relief on the First Amendment to the United States Constitution.

California Penal Code § 3605 requires that various persons be present to observe executions, including at least twelve reputable citizens. In a prior case, Judge Schnacke issued an injunction directing the warden of San Quentin, his successors and agents not to exclude all representatives of the media from the execution witness area. *KQED, Inc. v. Vasquez,* 1995 WL 489485, 18 Media L. Rptr. 2323, 2324 (N.D.Cal. 1991). Judge Schnacke appears to have based his decision on the First Amendment. See id. at 2325.

Judge Schnacke thus found a First Amendment overlay to the public right of access afforded under section 3605. This overlay, in Judge Schnacke's view, precluded the warden from excluding media representatives from those afforded access to witness an execution pursuant to section 3605. Judge Schnacke's opinion forms the point of departure for the court's analysis here.

In this case, the court is called upon to decide what aspects of the lethal injection procedure the witnesses, including the media representatives, must be allowed to see as a matter of constitutional norm. On May 1, 1996, the court issued a preliminary injunction preventing the defendants from precluding witnesses' observation of executions "from at least just before the time intravenous tubes are inserted to at least just after death." The parties have now filed cross-motions for summary judgment.

## I

Summary judgment is a method for the prompt disposition of an action in which there is no genuine issue of material fact. FRCP 56(c) provides for the granting of summary judgment where the moving party is entitled to judgment as a matter of law. The burden of establishing that there is no genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has met that burden by presenting evidence which, if uncontradicted, would entitle it to a directed verdict at trial, FRCP 56(e) shifts to the nonmoving party the burden of presenting specific facts showing that such contradiction is possible. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 950–52 (9th Cir. 1978).

A party opposing summary judgment may not rest upon the mere allegations or denials of his pleadings. Rather, responses, either by affidavits or as otherwise provided in the rule, must set forth specific facts showing that there is a genuine issue for trial. A mere "scintilla" of evidence supporting the nonmoving party's position will not suffice. There must be enough of a showing that the jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The question in summary judgment motions is whether reasonable minds could differ as to the import of the evidence. *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1288 (9th Cir.1987). "If the evidence is merely colorable * * * or is not significantly probative, summary judgment may be granted." Id. at 1288. The nonmoving party's evidence is to be taken as true and all inferences are to be drawn in the light most favorable to the nonmoving party. *Eisenberg*, 815 F.2d at 1289.

## II

■ Defendants first argue that the plaintiffs lack standing to "represent the interest of the general public." Defendants' memorandum does not make clear in what sense they are using the term "standing," nor does it suggest what conclusion the court should draw from this argument. Defendants cite *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 340, 97 S.Ct. 2434, 2440, 53 L.Ed.2d 383 (1977), a case that concerned whether the Washington Apple Advertising Commission had suffered an "injury-in-fact" for purposes of the Article III "case or controversy" requirement. Defendants do not suggest, however, that plaintiffs' members have not suffered an injury sufficient for constitutional standing. Defendants might be arguing that plaintiffs do not have third-party standing to assert the rights of "the general public." This seems an odd suggestion, however, because defendants rely heavily on the notion that the rights of the press in this matter are identical to the rights of the general public. If that is the case, then members of the press possess personally the rights defendants claim they cannot assert. In short, defendants have failed to make a persuasive showing either that plaintiffs lack standing to bring this suit or that they lack standing to assert the First Amendment rights they are claiming.

## III

In addressing the substantive issues of the case, defendants argue that the decision of

the court is controlled by *Houchins v. KQED,* 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). In *Houchins,* the Supreme Court determined that the First Amendment does not guarantee press access to prison facilities or inmates. Id. at 18, 98 S.Ct. at 2598. The opinion rests on the notion that the press does not have a right to all sources of information in the possession of the government. Id. at 9, 98 S.Ct. at 2593. In the case of prison conditions, the Court indicated that the state legislature was best placed to decide how access to information would be provided. Id. at 12, 98 S.Ct. at 2595.

Defendants assert that *Houchins* is directly on point. Executions take place within prison walls and, therefore, *Houchins* says that the First Amendment does not guarantee access to them. This argument seriously oversimplifies matters. Executions are fundamentally different from the everyday workings of the prison system. The death penalty remains a salient political issue in this country because, as both its supporters and its critics contend, it is a unique punishment. See *Satterwhite v. Texas,* 486 U.S. 249, 262, 108 S.Ct. 1792, 1800, 100 L.Ed.2d 284 (1988) (Marshall, J., concurring) ("The awesome severity of a sentence of death makes it qualitatively different from all other sanctions"). California has recognized the singularity of execution in a number of ways, the most relevant to this case being the enactment of Penal Code § 3605, which requires that certain people, including at least twelve reputable citizens, are present at every execution. The *Houchins* opinion provides no indication that the Court had in mind the unique issues implicated by executions when it reached its decision. Under those circumstances, the court declines to read *Houchins* as broadly as the defendants suggest.

### IV

While *Houchins* made clear that the right to gather news did not include a "right of access to all government-controlled sources of information," id. at 7–8, 98 S.Ct. at 2593, a series of decisions which followed has established that access to certain government-controlled sources of information related to the criminal justice system is protected by the First Amendment, see *Press–Enterprise Co. v. Superior Ct.,* 478 U.S. 1, 8–9, 106 S.Ct. 2735, 2740, 92 L.Ed.2d 1 (1986) ("*Press–Enterprise II*") (preliminary hearings); *Press–Enterprise Co. v. Superior Ct.,* 464 U.S. 501, 510–13, 104 S.Ct. 819, 824–26, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I*") (voir dire); *Globe Newspaper Co. v. Superior Ct.,* 457 U.S. 596, 610–11, 102 S.Ct. 2613, 2622–23, 73 L.Ed.2d 248 (1982) (trial involving sex crimes against minors); *Richmond Newspapers, Inc. v. Commonwealth of Virginia,* 448 U.S. 555, 580, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980) (criminal trial). In finding a right of access in these situations, the Court considered two principal factors: (1) whether access existed historically; and (2) whether access serves an important function. *Press–Enterprise II,* 478 U.S. at 8, 106 S.Ct. at 2740. While the cases from which the Court fashioned these elements of decision concerned the trial phase of the criminal justice process, there is no reason to believe that the Court's analytical framework would not apply equally to the punishment phase.

### A

Punishment by execution almost certainly predates the historical record. In England up to the thirteenth century, much criminal law enforcement was accomplished by mobilizing the local peasantry to chase down offenders and execute them on the spot. 2 Sir Frederick Pollock and Frederic W. Maitland, *The History of English Law* 578–79 (Lawyers' Literary Club 1959) (2nd ed 1898). Upon discovering a crime, English villagers had a responsibility to raise the "hue and cry." Id. Everyone in the village would then seek out the offender, who, if caught with the incriminating evidence, would "be brought before some court * * * and without being allowed to say one word in self-defence, he [would] promptly be hanged, beheaded or precipitated from a cliff." Id.

During the middle ages, confinement served only the pretrial function of assuring the accused's appearance at trial, not as a form of punishment. John H. Langbein, *Torture and the Law of Proof: Europe and England in the Ancient Regime* 28–29 (1977). England began establishing work-

houses for the poor, the precursor of the prison, in the sixteenth century. Id. at 33. Although created for purposes other than criminal sanction, these institutions began receiving persons convicted of serious crimes roughly a century later. Id. at 38. A second alternative to capital sanctions, transportation to America, was developed in the seventeenth century. Id. at 39. After the Act of 1717 overruled colonial legislation restricting transportation, large numbers of convicts were sent to work in the colonies rather than being executed. Id. at 40.

In the early days of the Massachusetts Bay colony, settlements were intimate communities. Deeply religious people who all knew one another, the colonists' punitive efforts focused on rehabilitation, monetary sanction and, for serious offenders, public confession of wrongdoing. Adam J. Hirsh, *From Pillory to Penitentiary: The Rise of Criminal Incarceration in Early Massachusetts,* 80 Mich. L Rev 1179, 1223–24 (1982). Later, the Massachusetts settlers utilized the pillory, stocks, and public flogging to impose punishment by public humiliation. Id. at 1225. The most severe form of punishment, banishment, was reserved for nonresidents or habitual offenders. Id. at 1224. Gradually, as the colonies became more diverse and their population less sparse, these methods grew less effective. Id. at 1229–31. By the middle of the eighteenth century, capital punishment was being applied to a wider range of offenses. Id. at 1236.

In both England and America, the executions that did take place were public spectacles. Tyburn was one of the principal sites for English hangings. John Laurence, *A History of Capital Punishment* 177 (1960). The day on which executions took place was known as "Tyburn Fair" or the "Hanging Match." 1 Leon Radzinowicz, *A History of English Criminal Law* 171 (1948). People even paid to enter the jail to view the prisoner in the days leading up to the event. Id. at 168. On the appointed day, the condemned were literally paraded to the execution site "in carts, * * * manacled, seated upon their own coffins, and accompanied by a chaplain." Id. at 171. "Sometimes the assembled spectators showed their reprobation of the crimi-

nal, but this was exceptional; he was almost invariably applauded and fruits and flowers were thrown at him." Id. at 172.

In America, the events surrounding executions were similarly public, but more subdued, and had a religious component. Historian Louis Massur describes how a man was hanged before a crowd of thousands gathered on the New Haven, Connecticut green in October 1790. Louis Massur, *Rites of Execution: Capital Punishment and the Transformation of American Culture. 1776–1865* 25 (1989). On that day, a procession was held from the jail to First Church. Id. The reverend, James Dana, delivered a sermon on the intent of capital punishment, and the crowd then proceeded to the site of the execution. Id. at 25–26. The condemned man had the option of riding atop his coffin, as in England, but chose to walk. Id. at 26.

Beginning with Pennsylvania in 1786, the states gradually reduced the number of capital offenses. Id. at 71. Over the next two decades, the states began constructing penitentiaries, led by the Quakers of Pennsylvania. Id. at 86–88. These institutions were conceived as places where criminals could ponder their offenses in solitude and recover their capacity to resist temptation. Id. at 80–82.

When penitentiaries were first built, their proponents did not suggest moving executions into them. Id. at 95. But by 1830, critics were decrying the rioting, drunkenness and other licentiousness associated with public hangings. Id. The Pennsylvania legislature began to explore the idea of "private" executions after the hanging of John Lechler in Lancaster drew a crowd estimated at between fifteen and forty thousand people. Id. at 96. Although no particular disturbances were reported, concerns emerged regarding the event's deleterious effect on the crowd's collective morals and the amount of potentially productive time wasted on the spectacle. Id. at 96–97. Massur also notes that reports of public disorder and rioting throughout the country increased in the 1820s and 30s, peaking in about 1834. Id. at 100–101.

In the context of these concerns, Pennsylvania eliminated public executions in 1834, followed the next year by New York, New

Jersey and Massachusetts. Id. at 94. This change was not without its critics. A year before Pennsylvania passed its statute, a New Hampshire clergyman reported that "it has been proposed to substitute for public, private executions in the criminal's cell, in the presence of none, except the ministers of justice. * * * [T]his would open the door to the greatest abuses." Id. at 110. When it came about, however, the relocation of hangings to within prison walls did not eliminate public participation. As California's statute would later do, the Pennsylvania act required that at least "twelve reputable citizens" be present at the execution. Id. at 111. In fact, crowds of one to three hundred people attended some "private" executions during the 1830s and 40s. Id.

From the beginning, moreover, eyewitness reports of private executions were provided by the then-emerging medium of the daily newspaper. Id. at 114. In 1858, the same year California passed its statute moving executions inside prison walls, the Daily Evening Bulletin in San Francisco reported the hanging of Henry F.W. Mowes. Pl. Exh. 33. According to the paper, about one-hundred spectators, including ministers, officers, doctors and lawyers, gathered within the walls of the prison to witness the event. Id. Plaintiffs have submitted articles recounting other California executions dating from the 1860s to the 1960s. Pl. Exhs. 11, 36–43, 47–49, 53, 55–56, 58, 60, 64–66.

Only one case cited by defendants suggests that the press may not always have been permitted to cover executions in the 160 year period since they began to be moved within prison walls. In 1890, the Supreme Court denied a petition for habeas corpus where the petitioner claimed that Minnesota had subjected him to an ex post facto law by applying a statute that had been amended to require solitary confinement prior to execution. *Holden v. Minnesota*, 137 U.S. 483, 487, 11 S.Ct. 143, 144, 34 L.Ed. 734 (1890). He argued that the law existing at the time of the offense would not have subjected him to solitary confinement prior to his execution and, therefore, the entire statute was an ex post facto law as applied to him. Id. In ruling on this issue, the Court noted that one

section of the act barred the attendance of newspaper reporters at executions and made publishing accounts of them a misdemeanor. Id. at 486, 11 S.Ct. at 144. The Court found that the imposition of these restrictions did not make the law ex post facto. Id. at 491, 11 S.Ct. at 146. With the exception of this single reference, the parties have provided the court with nothing to suggest that the press has not traditionally attended executions.

This brief historical recital denotes a tradition of public access to executions. Journalists' participation in this access seems almost, if not quite, as clear. Certainly, Judge Schnacke did not seem troubled that the press stood on any less firm footing in demanding access to witness executions than the public. So even as executions have been increasingly sheltered, there appears no historical precedent for precluding either the public or the press from witnessing executions.

### B

History informs First Amendment inquiry. History plainly seems to favor both public and press access to executions. In its First Amendment jurisprudence, the Supreme Court has also looked to the functional importance of public access. See *Press–Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8, 106 S.Ct. 2735, 2740, 92 L.Ed.2d 1 (1986) ("*Press–Enterprise II*"). The Supreme Court's cases concerning the right of public and press access to the criminal justice process have addressed aspects of the trial, rather than the imposition of punishment. In the trial context, public access is thought necessary either to instill confidence that justice is administered in a fair and even-handed fashion or to inform the community when justice is not even-handed and reform measures are therefore necessary. "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed." *Press–Enterprise Co. v. Superior Ct.*, 464 U.S. 501, 508, 104 S.Ct. 819, 823, 78 L.Ed.2d 629 (1984) ("*Press–Enterprise I*").

Like trials, executions implicate fundamental aspects of government and the legal process. Short of waging war, capital punish-

ment indisputably represents the ultimate exercise of state power. When the state chooses to wield its authority in this way, the people must have confidence that it does so within the boundaries prescribed by law. As with the trial, every citizen need not attend an execution in order to be assured that no untoward conduct has occurred; the presence of a group of "reputable citizens" has traditionally served that purpose. In our highly populated and widely dispersed republic, the media almost invariably now serve as the public's surrogate. Hence, even though the historical basis for the media's witnessing of executions is somewhat less clear than that of the public generally, it is no stretch to suggest that the public's right of access includes a right of media access.

### C

While the foregoing analysis establishes the historical and functional bases for a First Amendment right to witness executions, the resolution of this case requires that the court also determine what aspects of the execution procedure are encompassed by that right. In addressing the trial process, the Supreme Court has evaluated the First Amendment right of access to particular procedural stages using the same historical and functional analysis it applied to access to the trial generally. See *Press–Enterprise II*, 478 U.S. at 10, 106 S.Ct. at 2740 (applying historical and functional approach to preliminary hearings); *Press–Enterprise I*, 464 U.S. at 505, 104 S.Ct. at 821 (noting utility of examining history of access to voir dire). History and functional value are, therefore, the appropriate factors to consider in assessing which aspects of the execution process must be open to the representatives of the public.

Because lethal injection is a relatively recent development, see Martin R. Gardner, *Executions and Indignities—An Eighth Amendment Assessment of Inflicting Capital Punishment*, 39 Ohio State L.J. 96, 128–129 (1978), the court must look to other means of execution in order to ascertain the relevant historical practice. The newspaper accounts submitted by plaintiffs describing California executions from 1858 onward indicate that the witnesses had differing degrees of access on different occasions. One report from 1884 suggests that the reporter spent the twelve hours preceding the execution with the condemned. Pl. Exh. 37. In later years, the crowd saw the prisoner mount the gallows, see, e.g., Pl. Exh. 40, or enter the gas chamber, see, e.g., Pl. Exh. 48. Defendants have neither contested this evidence nor offered any contrary evidence. Although a firm and fixed practice cannot be discerned from this evidence, it is clear that members of the public, including representatives of the news media, have traditionally been able to view the procedure at least from before the condemned was attached to the lethal apparatus to at least just after the onset of death. See Pl. Exhs. 11, 33, 36–43, 47–49, 53, 55–56, 58, 60, 64–66.

In order to perform the function of serving as the public's eyes and ears, it is essential that those admitted to witness an execution be able to perceive the nature and quality of the event. Identifying the procedures which define the act of execution and convey its nature and quality is an inexact task which the court is hesitant even to attempt. Based on the record in this case, however, it is clear that the witnesses at the Bonin execution saw too little to apprehend fully the essence of the event. The declarations of several witnesses, unchallenged by defendants, indicate that they were not able to determine whether the prisoner had been sedated and were hardly able to perceive that anything occurred during the time they were in the observation room.

Limitations of the sort present at the Bonin execution sharply reduce the utility of having witnesses present and require an unacceptable reliance on information provided by officers of the state. The fact that these officers' most important actions must be independently observed by representatives of the citizenry does not reflect negatively upon them or their office, but rather serves as a demonstration that our government is founded on the principle that the rights of the people should be jealously guarded against the power of the state.

■ Because "the tradition of accessibility implies the favorable judgment of experience," *Press–Enterprise II*, 478 U.S. at 8, 106

S.Ct. at 2740, and "public access plays a significant positive role in the functioning of the particular process in question," id., the court finds that the First Amendment guarantees that the witnesses attending executions be able to view the procedure from a point in time prior to the immobilization of the condemned by confinement to the apparatus of death, in the case of lethal injection, the gurney, until shortly after his death.

It may be that future executions will demonstrate the need to open further the window of public access in order for witnesses to see and appreciate the nature and quality of execution through lethal injection. Alternatively, future executions may demonstrate the need for limitations on public access to lethal injection executions not found necessary when other methods of execution have been employed. Based on what is now before the court, the degree of access directed here is the minimum necessary to conform this relatively new method of execution to historical practice and the functional values of the First Amendment.

V

■ Although the First Amendment protects access to executions, the warden's limitations may be constitutional if the court finds that they serve "an overriding interest" and are "narrowly tailored to serve that interest." *Press–Enterprise I*, 464 U.S. at 510, 104 S.Ct. at 824. Defendants suggest that the court instead apply the "rational relation" test generally applicable to prison regulations that impinge on constitutional rights. See *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). The court recognizes the difficulties inherent in prison administration, see id., but, as noted above, the imposition of capital punishment does not fall within the bounds of the everyday workings of the penal system. For the same reasons that *Houchins v. KQED* does not control this case, see above at III, the "rational relation" standard provided by *Turner v. Safley* is inappropriate to these circumstances.

As indicated at the hearing on the preliminary injunction, the safety of prison personnel is a compelling state interest. See *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979) ("maintaining institutional security [in prisons] and preserving internal order and discipline are essential goals"). The defendants have not, however, raised a genuine issue of material fact regarding whether limiting the view of witnesses to an execution is "narrowly tailored" to serve that interest. Defendants have provided no evidence that the identities of prison personnel performing previous executions have been disclosed by witnesses, much less that any harm has resulted from such disclosure. Plaintiffs have suggested that the identities of these individuals could be protected by the use of surgical masks and gowns. Defendants argue that this attire would be unprofessional, undignified and possibly ineffective. Defendants' concerns about professionalism and dignity are understandable and laudable, but they simply do not rise to the level of a compelling state interest when weighed against the awesomeness of the state's imposition of death as punishment. Defendants have not presented any evidence that either the surgical outfits or some other method of hiding their distinguishing features would fail to protect the safety of prison personnel without infringing upon the First Amendment rights of the witnesses.

■ For these reasons, the plaintiffs' motion for summary judgment is GRANTED. Defendants are directed to allow the witnesses to executions by lethal injection to view the procedure at least from the point in time just prior to the condemned being immobilized, that is strapped to the gurney or other apparatus of death, until the point in time just after the prisoner dies.

IT IS SO ORDERED.