**In re GLOBE NEWSPAPER COMPANY, Petitioner.**

**No. 83–1866.**

United States Court of Appeals, First Circuit.

Argued Jan. 4, 1984.
Decided March 9, 1984.

James F. McHugh, Boston, Mass., with whom Ellen G. Grant, and Bingham, Dana & Gould, Boston, Mass., were on brief, for petitioner.

Janis Berry, Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Jeremiah T. O'Sullivan, Diane M. Kottmyer, and Ernest S. Dinisco, Sp. Attys., Dept. of Justice, Boston, Mass., were on brief, for the U.S.

Deborah Noonan, with whom Joseph T. Travaline, Burlington, Mass., was on brief, for respondent.

Before COFFIN, BOWNES and BREYER, Circuit Judges.

COFFIN, Circuit Judge.

Globe Newspaper Company seeks access to the bail proceedings in the pending criminal case *United States v. Angiulo.* Because much of the evidence presented during the bail proceedings consisted of conversations intercepted by electronic surveillance carried out pursuant to the federal wiretap statute ("Title III"), the magistrate conducting the bail hearings closed portions of the hearings to the public and impounded the hearing transcripts and some of the documents presented during the hearings. The United States District Court for the District of Massachusetts affirmed the magistrate's closure and impoundment orders; Globe asks this court to dissolve the closure order and release the impounded documents. We find that the privacy and fair trial interests of the defendants outweigh the public's interest in having access to the bail proceedings, and so we deny Globe's petition.

## I. Facts

On September 19, 1983, a Boston grand jury returned an indictment charging Angiulo and six others with criminal activity in violation of the anti-racketeering statute, 18 U.S.C. § 1962(c) and (d). The predicate acts alleged in the indictment include conspiracy to murder a grand jury witness, obstruction of state law enforcement, and obstruction of justice. At a bail hearing on September 20, the government offered a memorandum and the affidavit of an FBI agent in support of its motion to deny bail to two of the defendants and to impose strict conditions of release on the others. Both documents contained excerpts from conversations intercepted during the electronic surveillance of two premises used by the defendants, one of them a non-residential apartment alleged to be the headquarters of the defendants' criminal organization.

The magistrate, concerned that this material had the potential to create prejudicial pretrial publicity, called a recess in the bail proceeding and scheduled a hearing so that representatives of local media could present their views on whether the documents should be sealed. At the conclusion of the hearing, the magistrate entered an order impounding the affidavit and memorandum. He closed the bail hearing to the public so that the parties could freely discuss the material contained in the impounded documents. When this discussion had ended, the magistrate reopened the proceedings and announced the bail conditions that he had set for the defendants.

The following day the magistrate issued a written memorandum and order explaining that "considerations of defendants' Sixth Amendment right to a fair trial, when considered in *combination* with defendants' [privacy] rights under the provisions of Title III, unequivocally outweigh the public's right of access to the overheard conversations at this time" (emphasis in original). This order also provided that the transcript of the closed portion of the hearing would be impounded; that the government attorney should file "marked up" copies of the impounded memorandum, affidavit, and transcript indicating to the court which portions of those documents did not disclose intercepted communications; and that "any aggrieved party, including representatives of the media", could apply for modification of the terms of the order.

Three of the defendants filed motions for reduction of bail, and those motions were scheduled for a hearing on September 27. The magistrate held an "access" hearing earlier the same day and determined that certain portions of the FBI agent's affidavit could be unsealed.[1] He ordered that the portions of the affidavit that were the fruits of electronic surveillance remain under seal. Because the parties on both sides

1. In an order issued October 3, 1983, the magistrate held that the "marked up" copies of the memorandum and hearing transcript showed that non-Title-III material in those documents was "inextricably intertwined" with Title III material, so no portions of those documents could be unsealed. He noted, "To the extent that the Memorandum and Transcript relate to matters other than Title III 'overhears', those are matters which have already been spread upon the public record. Thus, as to these latter matters, the public has already been informed".

said that they could not structure their bail reduction arguments in a way that separated discussion of Title III matters from discussion of other matters, the magistrate ordered that the bail reduction hearings be closed in their entirety. He determined that an additional affidavit submitted by the government contained Title III material and should be impounded. The magistrate closed portions of subsequent bail modification hearings when the Title III material was under discussion.

The district court affirmed the magistrate's order, basing its decision principally on the fact that the defendants had not yet had an opportunity to test the legality of the electronic surveillance that produced the Title III material. Globe argues that because the defendants in *United States v. Angiulo* are alleged to be members (and, in some cases, high officials) of the Mafia, the proceedings against them have generated intense public interest. Globe contends that the public should have access to those proceedings. Globe seeks to have this court dissolve the order impounding the memorandum, affidavits, and transcripts. In addition, Globe requests that this court instruct the district court to allow public access to future bail proceedings in the *Angiulo* case.

Globe originally petitioned this court for writs of mandamus and prohibition after the district court had indicated orally that it would not modify the magistrate's orders of closure and impoundment. Before we had ruled on Globe's petition, the district court issued a memorandum and order affirming the magistrate's closure order; Globe filed a notice of appeal from that judgment and moved to consolidate the appeal with its petition for mandamus. We note that there is some question whether Globe, which is not a party to the underlying action, has standing to challenge the closure order by appeal.[2] We have no need to answer this question in the instant case, because the issue that Globe raises is sufficiently novel and important to justify mandamus review. *See United States v. Brooklier,* 685 F.2d 1162 (9th Cir.1982); *Sacramento Bee v. United States District Court,* 656 F.2d 477 (9th Cir.1981).

Although this court has recognized a limited First Amendment interest in the fruits of civil discovery, *In re San Juan Star Co.,* 662 F.2d 108 (1st Cir.1981), the argument that the public has a constitutional right of access to bail proceedings presents a question new to this circuit. In order to resolve the issues before us, we first examine the nature and extent of the public's right of access to pretrial proceedings. Finding that the First Amendment does give the public a right to attend bail hearings, we discuss the nature and extent of the defendants' right to privacy guaranteed by Title III and their Sixth Amendment right to a fair trial. Finally, we adopt a procedure for weighing these competing

2. *See generally United States v. Chagra,* 701 F.2d 354 (5th Cir.1983) (discussing media standing). Some courts have allowed media representatives to bring such challenges. *See, e.g., Belo Broadcasting Corp. v. Clark,* 654 F.2d 423 (5th Cir.1981); *United States v. Gurney,* 558 F.2d 1202 (5th Cir.1977). Some courts have held that media representatives may challenge closure orders by appeal if they first intervene in the underlying action. *See, e.g., United States v. Criden,* 675 F.2d 550 (3d Cir.1982); *United States v. Cianfrani,* 573 F.2d 835 (3d Cir.1978). Other courts have held that media representatives who are not parties to the underlying action may challenge closure orders only by petitioning for writs of prohibition or mandamus. *See, e.g., United States v. Brooklier,* 685 F.2d 1162 (9th Cir.1982); *Sacramento Bee v. United States District Court,* 656 F.2d 477 (9th Cir. 1981).

Recognizing the standing problem, the magistrate held that the media representatives who challenged his closure order in *Angiulo* "shall be construed as 'intervenors' to the extent that they shall be heard, upon proper application, vis a vis any and all claims of 'public access' to documents filed with the court, and hearings scheduled before this court". We have implicitly recognized the right of media representatives who have the status of intervenors in an underlying civil action to challenge closure orders by appeal. *In re San Juan Star Co.,* 662 F.2d 108 (1st Cir.1981). We have not decided—nor do we here—whether a media representative may, absent a rule for intervention analogous to Fed.R. Civ.P. 24, "intervene" in a criminal action for the purpose of appealing a closure order.

rights and conclude that the closure order in this case has struck the proper balance.

## II. The Public's Right of Access to Bail Proceedings

The Supreme Court has in recent years firmly established that the public has a First Amendment right of access to criminal trials. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). This right rests in part on the fact that "the criminal trial historically has been open to the press and general public" and in part on the fact that "public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government". *Globe Newspaper Co. v. Superior Court*, 457 U.S. at 605–06, 102 S.Ct. at 2619–20 (footnote omitted). The court has recently declared that the First Amendment right of access extends to the voir dire of prospective jurors. *Press-Enterprise Co. v. Superior Court of California*, — U.S. —, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984). The decision in *Press-Enterprise* is based on the same factors that informed the decisions in *Richmond Newspapers* and *Globe Newspaper*: the history of openness and the importance of public scrutiny of judicial proceedings. The Court's opinion in *Press Enterprise* suggests, although it does not state, that voir dire is a part of the trial itself rather than a pretrial proceeding. *See id.* at 824 and n. 8. The Court has not yet ruled on the question whether the First Amendment right of access extends to pretrial proceedings.

In *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), a case decided the year before *Richmond Newspapers*, the Court held that the Sixth Amendment right to a public trial did not create in the public a right of access to pretrial proceedings, but rather was a right personal to the accused. *Id.* at 381, 99 S.Ct. at 2906. The Court recognized as a possibility in *Gannett* what it later af-

firmed in *Richmond Newspapers* —that the Constitution incorporates a traditional common-law right of public access to criminal *trials* —but it noted that "there exists no persuasive evidence that at common law members of the public had any right to attend *pretrial* proceedings; indeed, there is substantial evidence to the contrary". *Id.* at 387, 99 S.Ct. at 2909 (emphasis added) (footnote omitted). The Court raised without deciding the question whether the First Amendment guaranteed access to pretrial proceedings. *Id.* at 392, 99 S.Ct. at 2911.

The circuit courts that have addressed the question whether there is First Amendment right of access to pretrial proceedings have answered it in the affirmative. *See, e.g., United States v. Chagra*, 701 F.2d 354 (5th Cir.1983) (right attends bail reduction hearings); *United States v. Brooklier*, 685 F.2d 1162 (9th Cir.1982) (right attends voir dire of prospective jurors and pretrial suppression hearings); *United States v. Criden*, 675 F.2d 550 (3d Cir.1982) (right attends pretrial suppression hearings). The right of access has also been extended to documents filed in pretrial proceedings. *See Associated Press v. United States District Court*, 705 F.2d 1143 (9th Cir.1983).

In *Chagra*, the Fifth Circuit observed that bail proceedings do not have the history of public access that the Supreme Court found significant in *Richmond Newspapers*. 701 F.2d at 362. The Fifth Circuit pointed out that bail is not always set in open court: the bail determination "is often made by the judge when an indictment is returned or by the magistrate when an arrest warrant issues". *Id.* at 363. The court noted, however, that bail proceedings have become more significant in recent years, and that "the lack of an historic tradition of open bail reduction hearings does not bar our recognizing a right of access to such hearings". *Id.* It held:

"Pretrial release proceedings require decisions that attract significant public interest, and invite legitimate and healthy public scrutiny. We, therefore, agree with the Third Circuit's conclusion that

'the same societal interests ... that mandated a first amendment right of access to criminal trial in *Richmond Newspapers* apply' to pretrial criminal proceedings, *Criden*, 675 F.2d at 557, and we extend this to bail reduction hearings.... [W]hile the public and press may request access to bail hearings held in court or other places that traditionally are open to the public, nothing in this opinion should be construed as forbidding the more informal bail procedures discussed above." 701 F.2d at 363–64.

In recognizing a First Amendment right of access to documents filed in pretrial proceedings, the Ninth Circuit noted that the two factors on which the Supreme Court relied in *Globe Newspaper* —a traditional right of public access and a need to preserve that access in order to enhance the operation of the judicial system—applied to pretrial documents. *Associated Press v. United States District Court*, 705 F.2d at 1145. The court held that "pretrial documents, such as those dealing with the question whether [the defendant] should be incarcerated prior to trial ..., are often important to a full understanding of the way in which 'the judicial process and the government as a whole' are functioning". *Id.* (quoting *Globe Newspaper* ).

■ We believe that the reasoning of these cases is sound. The same policy concerns that the Supreme Court identified when it found that the public has a First Amendment right of access to criminal trials—the need for a public educated in the workings of the justice system and for a justice system subjected to the scrutiny of the public—operate in pretrial proceedings. The decision to release on bail an accused who subsequently flees the jurisdiction may effectively end the trial before it has begun; the decision to hold an accused without bail deprives of his liberty a citizen

who has not yet been convicted of a crime. In either case, the bail decision is one of major importance to the administration of justice, and openness will help to assure the public that the decision is properly reached.[3] *See Press-Enterprise Co. v. Superior Court of California*, 104 S.Ct. at 823. In addition, we note that the bail proceedings at issue in the present case were not informal *in camera* bail determinations, but rather were hearings initiated in open court to which the public would ordinarily be admitted. We hold that Globe's interest in access to these bail proceedings enlists the First Amendment in its favor.

To say that the public has a First Amendment right of access to pretrial proceedings setting and modifying bail, and to the documents on which the bail decisions are based, does not end our inquiry. The Supreme Court has emphasized that the public's right of access to criminal proceedings is not absolute, and that it must in some circumstances give way to the paramount rights of the accused. *See Press-Enterprise Co. v. Superior Court of California*, 104 S.Ct. at 823–24; *Globe Newspaper Co. v. Superior Court*, 457 U.S. at 606, 102 S.Ct. at 2620; *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. at 581 n. 18, 100 S.Ct. at 2830 n. 18. In the case before us, the defendants have asserted two rights in support of the decision to close the bail proceedings: a Sixth Amendment right to a fair trial and a right of privacy attending the information obtained by electronic surveillance.

### III. The Fair Trial and Privacy Rights of the Defendants

The Supreme Court has recently observed that "[n]o right ranks higher than the right of the accused to a fair trial". *Press-Enterprise Co. v. Superior Court of California*, 104 S.Ct. at 823. In cases that

---

3. The need for openness to encourage public confidence in the justice system is illustrated by the circumstances of the present case. The defendants have been accused of obstructing justice in other forums and might in consequence be suspected of using illicit means to secure favorable conditions of release in this forum.

Alternatively, the public might think that the defendants' alleged association with the Mafia biased the court against them and prompted it to impose unduly harsh conditions of release. Several of the defendants have made this latter argument in a motion for disqualification of the magistrate.

arouse intense public interest, as *United States v. Angiulo* has already done,[4] "adverse publicity can endanger the ability of the defendant to receive a fair trial". *Gannett Co. v. DePasquale*, 443 U.S. at 378, 99 S.Ct. at 2904. The Supreme Court has held:

> "To safeguard the due process rights of the accused, a trial judge has an affirmative constitutional duty to minimize the effects of prejudicial pretrial publicity. And because of the Constitution's pervasive concern for these due process rights, a trial judge may surely take protective measures even when they are not strictly and inescapably necessary." *Id.* (citation omitted).

Although the Court has seldom approved prior restraints on publication, which it regards as "the most serious and the least tolerable infringement on First Amendment rights", *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 96 S.Ct. 2791, 2802, 49 L.Ed.2d 683 (1976), it has placed a lighter burden of justification on courts that seek to protect Sixth Amendment rights by denying the public access to pretrial procedures. *Gannett Co. v. DePasquale*, 443 U.S. at 392–93 and n. 25, 99 S.Ct. at 2911–12 and n. 25.

When the rights of the accused and those of the public come irreconcilably into conflict, the accused's Sixth Amendment right to a fair trial must, as a matter of logic, take precedence over the public's First Amendment right of access to pretrial proceedings. There is little to be gained by admitting the public to pretrial proceedings in order to promote the appearance of fairness if the very presence of the public makes a fair trial impossible. The possibility of unfavorable publicity does not, however, automatically justify the court in closing pretrial proceedings. As the Court noted in *Nebraska Press*, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial". 427 U.S. at 554, 96 S.Ct. at 2800. The trial court must consider the nature and extent of publicity that the case is likely to arouse and determine whether alternatives less restrictive than closure will protect the accused's right to a fair trial. For example, this court observed in *Colon Berrios v. Hernandez Agosto*, 716 F.2d 85 (1st Cir. 1983), that "impartial jurors have been selected in many highly publicized criminal cases by the use of a rigorous and searching voir dire of the jury venire" and that the jurors chosen could be "emphatically and clearly instructed to decide the case only on the evidence presented in court". *Id.* at 92.

The fair trial problem presented in this case is compounded by the presence of extremely damaging statements intercepted during an electronic surveillance of two locations at which defendants allegedly planned and carried out illegal activities. The surveillance was judicially authorized pursuant to the provisions of Title III, 18 U.S.C. § 2510 *et seq.* Because "the protection of privacy was an overriding ... concern" of Congress when it enacted Title III, *Gelbard v. United States*, 408 U.S. 41, 48, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972), the statute requires "strict regulation of the use of electronic surveillance and strict regulation of the use to which information gathered through electronic surveillance may be put". *Providence Journal Co. v. F.B.I.*, 602 F.2d 1010, 1012 (1st Cir.1979).

Unless a wiretap is conducted in compliance with the provisions of Title III, it is unlawful. 18 U.S.C. § 2511. One who discloses the contents of an unlawful wiretap may be subject to both criminal and civil penalties. 18 U.S.C. §§ 2511(1), 2520. The statute provides that the fruits of electronic surveillance may not be "received in evidence in any trial, hearing, or other proceeding in or before any court ... if the disclosure of that information would be in violation" of Title III. 18 U.S.C. § 2515. Section 2518(10)(a) "provides the remedy for the right created by section 2515", S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.

---

4. The magistrate found that the defendants' indictment and arrest had, at the time of the initial bail hearing, already excited extensive commentary from the media.

News 2112, 2195, by allowing "any aggrieved person" to move to suppress the Title III material in any court proceeding on the ground that the surveillance was not properly authorized, that it was not carried out in conformity with the order of authorization, or that it otherwise failed to comply with the provisions of Title III. In order to make the suppression right meaningful, the statute provides that the fruits of an electronic surveillance may not be disclosed in any court proceeding "unless each party, not less than ten days before the ... proceeding, has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved". 18 U.S.C. § 2518(9).[5]

The extensive disclosure restrictions of Title III reflect Congress's recognition that when communications are unlawfully intercepted, "the invasion of privacy is not over when the interception occurs, but is compounded by disclosure". *Providence Journal Co. v. F.B.I.*, 602 F.2d at 1013. The purpose of the suppression remedy is not only to protect the privacy of individuals whose communications are unlawfully intercepted, but also to protect the public's interest in deterring unlawful searches. *Id.; see also United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974) (holding that the exclusionary rule's "prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures ..."). It is clear, then, that if an electronic surveillance has been shown to be unlawful, Title III prevents its fruits from being disclosed to the public, and both Title III and the Fourth Amendment forbid

the use of its fruits as evidence in any court proceeding. *See Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (discussing the applicability of the Fourth Amendment exclusionary rule to illegally seized communications). It remains for us to determine whether any privacy interest prevents disclosure of Title III materials when the parties whose communications were seized have not challenged the legality of the surveillance.

Globe argues that the suppression remedy of § 2518(10)(a) stands as the sole bulwark between the defendants' privacy rights and public disclosure of the fruits of the Title III surveillance at a judicial proceeding. It notes that either § 2517(2) or § 2517(3) of Title III authorizes the investigative officers to disclose the Title III material at a bail hearing.[6] In addition, the government, which supports Globe's petition, points out that the authorizing judge found at the conclusion of the surveillance that the wiretap orders were executed in compliance with the requirements of 18 U.S.C. § 2518. Globe suggests that unchallenged Title III materials are entitled to a presumption that they were lawfully obtained. It argues that unless defendants exercise their § 2518(10)(a) right to move for suppression of the material at the bail hearing, the court cannot close the hearings in order to prevent the disclosure of the Title III material.

This is "a comfortable doctrine, to which we can have but one objection: namely, that it is not true".[7] The provisions of § 2517 allow the disclosure of the Title III materials to the court conducting the bail hearings; they have no bearing on

---

5. The ten-day notice period of § 2518(9) may be waived, as it was in this case, if the court finds "that it was not possible to furnish the party with the ... information ten days before the ... proceeding and that the party will not be prejudiced by the delay in receiving the information". 18 U.S.C. § 2518(9).

6. Section 2517(2) provides that an investigative officer who has obtained knowledge of intercepted communications by means authorized by

Title III may use the material "to the extent such use is appropriate to the proper performance of his official duties"; § 2517(3) provides that any person may disclose lawfully-obtained Title III material "while giving testimony under oath or affirmation in any criminal proceeding in any court...."

7. H. Fielding, *Tom Jones*, Book XV, ch. 1 (speaking of the notion that virtue is rewarded).

the question whether the court may order those hearings closed to the public. The authorizing judge's preliminary finding that the surveillance was carried out in compliance with the order of authorization should not be used to create an irrebuttable presumption that the surveillance was lawful. Title III is an extremely complex statute with whose detailed provisions even the most meticulous law enforcement officer or authorizing judge might inadvertently fail to comply. *See generally United States v. Smith,* 726 F.2d 852 (1st Cir.1984) (discussing some of the problems that arise under a Title III surveillance or a surveillance conducted pursuant to the provisions of a parallel state statute). The suppression provisions of § 2518(9) and § 2518(10)(a) reflect Congress's belief that parties against whom Title III evidence is offered should have an opportunity to examine the documentation and test the legality of the surveillance. Although the court may rely on the apparent lawfulness of unchallenged Title III material during the course of any proceeding at which that material is properly admitted, the parties retain their right to challenge the lawfulness of the material at a later time.[8]

The circumstances of the present case illustrate why it would be unfair to force defendants to object to Title III material the first time it is presented to the court in order to prevent it from being disclosed to the world at large. On September 19, the day the indictment was returned against the defendants, the district court entered an *ex parte* order waiving the ten-day document inspection period of § 2518(9) and permitting the government to introduce the Title III material at the bail hearings. It based its finding that the defendants would suffer no prejudice from the delay in receiving the authorization orders for inspection in part on the fact that they would "have an opportunity to move to suppress the tape recorded conversations prior to their use at trial". The defendants first learned of the electronic surveillance on September 20, the day of the hearing to set their conditions of release. At this time they objected to public disclosure of the Title III material and indicated to the court that they anticipated filing a suppression motion before their trial. They did not receive the Title III applications and authorization orders, on which a motion to suppress would ordinarily be based, until September 26, the day before the first of the bail reduction hearings.

The defendants could not be expected to mount a challenge to the Title III material until they had had a fair opportunity to inspect the supporting documents; and they could not be expected to delay their challenges to the conditions of release while they marshaled their arguments for suppression. The scheduling of the suppression hearing rests within the sound discretion of the court. The court established on October 5 a schedule for the filing of various motions challenging the Title III surveillance, and it ordered that the suppression hearing be conducted no later than March 5, 1984. In a highly publicized case such as this one, the premature publication of damaging communications that are later determined to have been unlawfully obtained and so not admissible in evidence might make a fair trial impossible, at least in the venue defendant would ordinarily prefer. In addition, the public disclosure of communications intercepted in violation of Title III would vitiate the privacy protections of the statute. Until the Title III material has been tested at a suppression hearing, a court considering whether the material may be disclosed to the public should entertain the possibility that it was unlawfully obtained.

■ If the court concludes that the Title III material may not be disclosed because the parties have not had a fair opportunity to test the legality of the electronic surveillance, it does not necessarily follow that proceedings at which the Title III material

---

**8.** Section 2518(10)(a) requires that the aggrieved person make a suppression motion before the proceeding at which the Title III material is to be introduced as evidence "unless there was no opportunity to make such motion or the person was not aware of the grounds of the motion".

is offered in evidence may be closed in their entirety. The court must weigh the competing interests of the parties and the public and structure a remedy that gives the maximum protection to the rights of both.

## IV. Balancing the Interests of the Parties and the Public

■ When a court, acting *sua sponte* or on the motion of a party, considers whether to close a pretrial proceeding that would ordinarily be open to the public, it must meet three procedural requirements. First, it must allow members of the press and the public who are present at the time the closure motion is made "an opportunity to be heard on the question of their exclusion". *Gannett Co. v. DePasquale*, 443 U.S. at 401, 99 S.Ct. at 2916 (Powell, J., concurring). Second, it must weigh the competing interests involved and consider reasonable alternatives to closure, stating on the record its reasons for rejecting these alternatives "so that a reviewing court may be adequately informed". *Id.* at 446, 99 S.Ct. at 2939 (Blackmun, J., concurring in part and dissenting in part). Third, if it determines that closure is necessary, it must draw the closure order as narrowly as possible in order to minimize the intrusion on the public's First Amendment right to access. *See Press-Enterprise Co. v. Superior Court of California*, 104 S.Ct. at 823–24.

■ In the instant case, the magistrate complied with all of these requirements. When the question of closure was raised, he halted the bail proceedings and scheduled a hearing following a brief recess so that those members of the media who objected to closure would have an opportunity to present their arguments through coun-

sel.[9] He held another "access hearing" a week later before he closed the first of bail modification hearings. He assumed that the public did have a First Amendment right of access to the bail proceedings, and he carefully balanced that right against the defendants' Sixth Amendment right to a fair trial and their right of privacy. He asked counsel whether they would be able to structure their arguments in a way that would avoid mention of the Title III materials, and he examined the materials himself, so that he had an independent basis for judging whether they could be excluded from the bail hearing. He considered several less restrictive means for safeguarding the defendants' fair trial right—as, for example, a change of venue or a rigorous voir dire of prospective jurors—and advanced persuasive reasons for finding these alternatives unsatisfactory. He released those portions of the bail documents and opened those portions of the hearings that did not reveal the contents of the Title III material. He provided in his closure order that "any aggrieved party, including representatives of the media", could "seek modification of the terms of this order". In short, he exhibited sensitivity to the competing rights and interests of all the parties involved. It remains for us to determine whether he struck the proper balance among those rights.

Courts attempting to balance the public's First Amendment right of access to pretrial proceedings against the defendant's Sixth Amendment right to a fair trial have usually adopted one of the two tests set out in the separate opinions filed in *Gannett Co. v. DePasquale*. Justice Blackmun, with whom three other justices joined, suggested that the court must find that closure is

---

**9.** We recognize, as did the magistrate, that the brief recess and the even briefer access hearing (the former was one-and-one-half hours, the latter, one hour) required counsel for the press to present their arguments against closure quickly and at short notice; but we agree with the magistrate that "[i]nasmuch as the defendants were entitled to have bail set promptly, no reasonable alternative existed to further explore the matters relating to judicial access". We note

the language in *Gannett Co. v. DePasquale* to the effect that such an access hearing "need not take the form of an evidentiary hearing; it need not encompass extended legal argument that results in delay; and the public need not be given prior notice that a closure order will be considered at a given time and place". 443 U.S. at 446, 99 S.Ct. at 2939 (Blackmun, J., concurring in part and dissenting in part).

"strictly and inescapably necessary". 443 U.S. at 440, 99 S.Ct. at 2936. In order to support this determination, the defendant must show (1) "a substantial probability that irreparable damage to his fair-trial right will result from conducting the proceeding in public"; (2) "a substantial probability that alternatives to closure will not protect adequately his right to a fair trial", and (3) "a substantial probability that closure will be effective in protecting against the perceived harm". *Id.* at 441–42, 99 S.Ct. at 2936–37. The Ninth Circuit, noting that no definitive standard for closure had been adopted, decided that "[u]ntil the Supreme Court resolves these issues, prudence counsels adherence to the strict test stated by Justice Blackmun" in *Gannett. United States v. Brooklier*, 685 F.2d at 1167.

Justice Powell, disturbed by the "severe burden upon defendants seeking closure" imposed in Justice Blackmun's strict test, observed:

"It is difficult to imagine a case where closure could be ordered appropriately under this standard. A rule of such apparent inflexibility could prejudice defendants' rights and disserve society's interest in the fair and prompt disposition of criminal trials. As a result of pretrial publicity, defendants could be convicted after less than the meticulously fair trial that the Constitution demands." *Gannett Co. v. DePasquale*, 443 U.S. at 399, 99 S.Ct. at 2915 (Powell, J., concurring).

He suggested a slightly less stringent test for closure, in which (1) the defendant would "make some showing that the fairness of his trial likely will be prejudiced by public access to the proceedings", and (2) those who objected to closure "would have the responsibility of showing to the court's satisfaction that alternative procedures are available that would eliminate the dangers". *Id.* at 401, 99 S.Ct. at 2916. The Fifth Circuit, noting that Justice Powell's standard had been adopted both by the

Judicial Conference of the United States and by the Justice Department,[10] used a similar standard to determine whether the court had properly ordered the closure of bail modification hearings. *United States v. Chagra*, 701 F.2d at 364–65. The Fifth Circuit held:

"[A] defendant seeking closure of a pretrial bond reduction hearing overcomes the first amendment right of access to that hearing if he shows that:

(1) his right to a fair trial will likely be prejudiced by conducting the hearing publicly;

(2) alternatives to closure cannot adequately protect his fair trial right;

(3) closure will probably be effective in protecting against the perceived danger." *Id.* at 365.

■ There is a strong argument to be made that the less stringent standard produces a more equitable result, at least in the context of bail proceedings, where the court may receive evidence that is not admissible at trial and that consequently poses "a serious threat to the defendant's fair trial right". *Id.* at 364. We have no need, however, to choose between the two standards on this occasion, for we believe that the combined threat to defendants' fair trial right and their right to privacy is sufficient to meet even the strict standard for closure proposed by Justice Blackmun.

If the Title III material is found to have been legally obtained and to be admissible at trial, the public will eventually have access to that material, and to the transcripts of the bail hearings at which the material was introduced. Although we recognize the force of Globe's argument that this delay injures the First Amendment right of access, we think that the harm in delayed access is not as great as that in denied access. If, on the other hand, the Title III material is found to have been illegally obtained and to be inadmissible in whole or in part, the widespread publicity attending a premature release of that material will injure beyond repair the privacy right pro-

10. *See Revised Report of the Judicial Conference Committee on the Operation of the Jury System* on the *"Free Press—Fair Trial" Issue,* 87 F.R.D. 519, 535 (1980); 28 C.F.R. § 50.9 (1982).

tected by Title III. *Cf. Press-Enterprise Co. v. Superior Court of California*, 104 S.Ct. at 824 (suggesting that protective measures, including limited closure of voir dire, are appropriate to protect the privacy interests of prospective jurors). In addition, the disclosure of untested Title III material would jeopardize the defendants' fair trial right. Until the defendants have had a fair opportunity to test that material at a suppression hearing, the court cannot know whether it contains material that will be found to be inadmissible. If extremely damaging statements of the defendants are blazoned in the media before trial, it will be difficult for a juror who has been exposed to those statements to avoid considering them during trial even if he is carefully instructed that they are not part of the evidence on which his verdict must be based.

Of course, if the Title III material is tested at a suppression hearing and found to have been lawfully obtained, the fair trial problem takes on a different complexion. At that point, the question is not whether the defendants' fair trial right will be endangered by pretrial publicity given to statements inadmissible at trial, but whether it will be endangered by pretrial media commentary on evidence that the jurors will hear at trial. We express no opinion on the question whether this latter kind of pretrial publicity would be sufficient to warrant closure of the pretrial proceedings even after a suppression hearing had established that the Title III material was lawfully obtained. We find that the "substantial probability of irreparable damage" inherent in disclosure of the Title III material *before* defendants have had an opportunity to challenge that material is beyond question.

We think that the magistrate's decision also met the second and third criteria of Justice Blackmun's strict test for closure: the untested Title III material presented "a substantial probability that alternatives to closure [would] not protect adequately [defendants'] right to a fair trial" and "a substantial probability that closure [would] be effective in protecting against the per-

ceived harm". The privacy interest that attends the Title III material cannot be protected by any method other than preventing the material's disclosure to the public, since disclosure itself is the injury to be avoided. We do not intend to create a *per se* rule that a proceeding must always be closed if it involves Title III material whose legality has not been tested. The court may find in some cases that the Title III material is not sufficiently private to warrant protection, or sufficiently prejudicial to endanger the defendant's fair trial right: the material may, for example, merely repeat information that appears in the indictment. Even if the Title III material is both private and prejudicial, we think it is often possible for the parties to allude to that material without revealing its content. We note that in appealing the magistrate's bail determinations to the district court and to this court, the parties were able to refer to the intercepted communications by paragraph number. Yet in a case such as this one, where the government's suggested bail conditions were based in large part on the Title III material, we find ample support for the magistrate's determination that the parties should be able freely to discuss that material in their initial presentations to the court.

Because the untested Title III material might have been unlawfully obtained, it is unlikely that defendants' fair trial rights could be protected by any means short of closing the bail proceedings at which that material was discussed. It is difficult enough for a court to deal with the effects of widespread publicity of statements and events that can ultimately be proven at trial. It is adding difficulty of another magnitude to expect a court to try to remove the taint of publicity given to things said and done which, because of the illegality of the means by which they were discovered, will never be heard at trial. To the extent that defendants' fair trial rights are endangered by the premature disclosure of untested Title III material, closure of the proceedings at which that material must be discussed and impoundment of the docu-

ments in which that material is revealed clearly "will be effective in protecting against the perceived harm".

In sum, we find that the First Amendment right of access does extend to bail hearings and to documents filed in support of the parties' arguments at those hearings. We believe, however, that the interests of the press and the public weigh less heavily at this early point in the proceedings than they do later, both because the tradition of openness in bail hearings is not as strong and because the press and public will have later opportunities to examine the material admitted at those hearings. By contrast, the privacy and fair trial interests of the defendants are at their zenith during the bail hearings, since they have not yet had an opportunity to test the material admitted at the hearings. We can scarcely imagine a stronger case for closure than the one now before us, in which the defendants are accused of participation in organized crime, the pretrial publicity is intense, and the material to which the press seeks access is extremely prejudicial. If these bail proceedings must be open to the public, it is difficult for us to conceive of circumstances in which a pretrial proceeding could be closed.

We find that the magistrate and the district court were correct in concluding that closure and impoundment are necessary to protect defendants' privacy and fair trial rights until defendants have had a fair opportunity to challenge the legality of the Title III material. If the court determines that the intercepted communications must be discussed at the suppression hearing,[11] and that public disclosure of the communications cannot be prevented by means less restrictive than closure (as, for example, by instructing the parties to allude to the material by paragraph number), then it may properly close part or all of the suppression hearing. If the suppression hearing establishes that the Title III material was lawfully obtained and is admissible at trial, the court must consider whether the remaining danger of prejudicial pretrial publicity is sufficient to warrant continued closure of pretrial proceedings and impoundment of documents.

*The writs of mandamus and prohibition are denied.*

---

**11.** We think it likely that the suppression hearing will be primarily concerned with the sufficiency of the authorization and execution of the Title III surveillance, and that most, if not all, of this information will pose no threat to the defendants' privacy and fair trial rights.