303 F.Supp.2d 1041 (2004)
UNITED STATES of America, Plaintiff,
v.
Ralph INZUNZA, et al., Defendants.
No. 03CR2434JM.
United States District Court, S.D. California.
February 5, 2004.
*1042 Guylin Cummins, Esq., Gray Cary Ware & Freidenrich, San Diego, CA, Counsel for Copley Press, Inc.
Robert Ciaffa, Esq, Michael Wheat, Esq., Paul Cook, Esq., San Diego, CA, Counsel for Plaintiff.
R.J. Coughlan, Jr., Coughlan, Semmer & Lipman, LLP, San Diego, CA, Counsel *1043 for Michael Zucchet: (and specially appearing for Ralph Inzunza and David Cowan).
Dominic Gentile, Esq., Law Offices of Dominic Gentile, Las Vegas, NV, Counsel for Lance Malone.
Frank Ragen, II, Esq., Law Offices of Frank Ragen, San Diego, CA, Counsel for Charles Lewis.
ORDER GRANTING MOTION TO ITERVENE; DENYING MOTION FOR ACCESS TO SEALED COURT DOCUMENTS
MILLER, District Judge.

INTRODUCTION
This case presents the question whether the qualified First Amendment right of public access attaches to Title III wiretap materials and search warrant affidavits following the return of indictments but prior to a substantive challenge to those materials. The Copley Press, Inc. ("Copley"), publisher of The San Diego Union-Tribune, moves to intervene in this action to obtain access to all sealed records filed with the court in this case. The Government and Defendants Ralph Inzunza, Michael Zucchet, and Charles Lewis (collectively "Council Members") oppose the motion. Defendant Lance Malone appeared at the hearing and voiced his nonopposition to Copley's motion. Having carefully considered the record, pertinent legal authorities, and the arguments of counsel, the court grants the motion to intervene but denies the motion for access to sealed records without prejudice.

BACKGROUND
Because the parties are familiar with the allegations contained in the indictment, the court provides only a brief summary of the counts set forth in the indictment. On August 28, 2003 Defendants Council Members, Lance Malone, Michael Galardi, John D'Intino, and David Cowan were charged in a 39 count indictment. All Defendants except David Cowan are charged in Count 1 with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371. Counts 2-34 identify 33 separate acts whereby Defendants (except Cowan) allegedly used wire communications in interstate commerce in furtherance of the alleged conspiracy to defraud the public of their intangible right to honest service, in violation of 18 U.S.C. § 1346, and wire fraud, in violation of 18 U.S.C. § 1343. Count 35 and 36 allege that, on February 7, 2002 and again on October 14, 2002, Defendant Inzunza, aided by Zucchet, Galardi, Malone and D'Intino, unlawfully affected interstate commerce by "unlawfully obtain[ing] money from defendants Galardi, Malone, and D'Intino for the benefit of defendant Zucchet" in violation of 18 U.S.C. §§ 1951 (the Hobbs Act) and 1952 (Interstate Transportation in Aid of Racketeering). Counts 37 and 38 allege that Defendants Galardi, Malone, and D'Intino engaged in bribery of a police officer on May 4, 2001 and October 18, 2002 in violation of Cal.Penal Code § 67.5, all in violation of 18 U.S.C. §§ 1951 and 1952. Count 39 alleges that Defendant Cowan made a willful and materially false statement to the FBI when he stated "that he never discussed with Lance Malone the `no-touch' provision" of the San Diego ordinance in violation of 18 U.S.C. § 1001.
On December 4, 2003 the Government filed its response and opposition to Defendants' discovery motions related to possible Government misconduct. In that response, the Government submitted to the court, under seal, nine pages of intercepted telephone conversations. The Government submitted transcripts of the intercepts to support its argument that the undercover agent "had only one, exceedingly brief, telephonic contact with Defendants Inzunza and Lewis, separately." *1044 (Response at p. 6:17-19). At the time of the December 11, 2003 motions hearing, Defendants withdrew their discovery motion with respect to possible government misconduct, without prejudice, subject to renewal at a later date. Shortly thereafter, Copley filed its motion to unseal the transcript placed under seal as well as "all sealed records." (Motion at p. 1:9-10). In response to Copley's motion, the Government filed under seal copies of the intercepted telephone transcripts earlier submitted and the federal search warrant affidavit executed on May 14, 2003.

DISCUSSION
Motion to Intervene
Neither the Government nor Copley dispute that the public and press have a presumptive qualified right to seek access to pretrial criminal proceedings and documents. Whether the court treats the motion to intervene as a miscellaneous civil motion seeking access to court records, see In re Application of New York Times, 708 F.Supp. 603, 604 (S.D.N.Y.1989), or as a motion to intervene pursuant to Federal Rule of Civil Procedure 24(b), the result is the same. Copley has standing to seek access to court records.
Motion for Access to Sealed Records
The First Amendment recognizes "a general right to inspect and copy public records and documents, including judicial documents and records." Phoenix Newspapers v. United States Dist. Court, 156 F.3d 940, 946 (9th Cir.1998) (quoting Nixon v. Warner Communications, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)). However, "there is no right of access which attaches to all judicial proceedings, even all criminal proceedings." Id.; Times Mirror Co. v. United States, 873 F.2d 1210, 1217 (9th Cir.1989). In addition to a constitutional right of access, "there is a strong presumption in favor of the common law right to inspect and copy
judicial records." Phoenix Newspapers, 156 F.3d at 946.
Press-Enterprise II
Any discussion of the qualified First Amendment right of public access to criminal proceedings and records must begin with the leading case of Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (Press-Enterprise II). Press-Enterprise II sets forth the analytical framework to be followed in a case such as this. Under the two-step framework adopted by the Supreme Court, the court determines in the first instance whether a qualified First Amendment right of access attaches to the proceeding or documents at issue and, if so, then the court determines whether closure serves a compelling interest. The first step "emphasize[s] two complementary considerations" which should be separately analyzed on the threshold question of whether the First Amendment right of access even attaches to the proceeding or document. Id. at 8, 106 S.Ct. 2735. The court first considers "whether the place and process have historically been open to the press and general public." Id. Then, the court considers "whether public access plays a significant positive role in the functioning of the particular process in question." Id; Oregonian Publ'g Co. v. United States Dist. Court, 920 F.2d 1462, 1465 (9th Cir.1990). If these two "considerations of experience and logic" favor disclosure, a qualified First Amendment right of access attaches to the documents in question.
Once the court determines that a First Amendment right of access attaches to the particular proceeding or documents at issue, the proceedings or documents cannot be closed to the public absent a specific finding "that closure is essential to preserve higher values and is narrowly *1045 tailored to serve that interest." Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (Press-Enterprise I). The court must articulate that interest and make "findings specific enough that a reviewing court can determine whether the closure order was properly entered." Id. The Supreme Court "has made clear that criminal proceedings and documents may be closed to the public without violating the First Amendment only if three substantive requirements are satisfied: (1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." Oregonian Publ'g, 920 F.2d at 1466; Press-Enterprise II, 478 U.S. at 13-14, 106 S.Ct. 2735. In the context of disclosure of Title III intercepts, Press-Enterprise II requires the court to "balance the public's right of access against the privacy and fair trial interests of defendants, witnesses and third parties." United States v. Gerena, 869 F.2d 82, 85 (2d Cir.1989). The court must also consider "the privacy interest of innocent third parties as well as those of defendants that may be harmed by disclosure of the Title III material and should weigh heavily in a court's balancing equation in determining what portions of motion papers in question should remain sealed or should be redacted." Id.
In light of the standards developed to analyze qualified First Amendment right of access issues, the court turns to the experience and logic considerations.[1]
The Experience Consideration
In determining right of access issues, the historic context of the particular criminal proceeding at issue is significant not only "because the Constitution carries the gloss of history," but also because "a tradition of accessability implies the favorable judgment of experiences." Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 605, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). Certain aspects of criminal proceedings, such as access to criminal trials, have traditionally been open to the public throughout this country's history and even before in England, Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 569, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) ("at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open" to the public), but other aspects of criminal proceedings have not been open to the public. See Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211, 218, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979) ("the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings"). Courts have found an historic tradition of access to various aspects of criminal proceedings including jury voir dire, Press-Enterprise I, 464 U.S. 501, 104 S.Ct. 819; United States v. Brooklier, 685 F.2d 1162 (9th Cir.1982), preliminary hearings, Press-Enterprise II, 478 U.S. 1, 106 S.Ct. 2735, suppression hearings, Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), and bail hearings. In re Globe Newspaper Co., 729 F.2d 47 (1st Cir.1984).
Applying the experience factor, the court finds no historical tradition of open public access to Title III materials or search warrant affidavits at the present stage in this criminal proceeding. The Title III materials were initially submitted under seal to support the Government's response to Defendants' motions to obtain *1046 discovery concerning their claim of possible government misconduct.[2] Disclosure of Title III materials is permissible only under limited circumstances. Pursuant to 18 U.S.C. § 2517(3), intercepted conversations may be disclosed "while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof." However, the authority to disclose extends only to materials obtained "in accordance with the provisions of [Title III]." 18 U.S.C. § 2517(3). Accordingly, the only lawful way that the materials presently under seal can be made public under Title III is by being admitted into evidence at a criminal trial or at a suppression hearing, events which have yet to occur. See United States v. Dorfman, 690 F.2d 1230, 1233 (7th Cir. 1982). Compliance with Title III requirements is a prerequisite for disclosure. "[I]f an electronic surveillance has been shown to be unlawful, Title III prevents its fruits from being disclosed to the public." In re Globe Newspaper, 729 F.2d at 54. Here, the Title III materials, consisting of hundreds of hours of recordings, have yet to be tested. The court anticipates significant litigation regarding Title III materials and, at that time, Copley may renew its motion.[3]
With respect to the search warrant affidavits, the affidavits have been entered on the court's docket, not in reference to any suppression hearing, but in reference to Copley's instant motion for access. As with the Title III materials, the court anticipates significant challenges to the affidavits. Again, at that time, Copley may renew its motion.
The court emphasizes that an analysis of the historical tradition of openness depends on the particular stage of the proceeding at issue. For example, in Times Mirror, Copley and other media organizations sought access to search warrants and supporting affidavits relating to an ongoing investigation before any indictments had been returned. 873 F.2d at 1211. The Ninth Circuit surveyed the historic traditions of search warrant proceedings and concluded that "no historical tradition of open search warrant proceedings and materials" existed. Id. at 1214. The court noted that "the experience of history implies a judgment that warrant proceedings and materials should not be accessible to the public, at least while a pre-indictment investigation is still ongoing as in these cases." Id. The court concluded that there did not exist either a constitutional or common law right of access to the search warrant affidavits. However, the Ninth Circuit specifically left open "the question whether the public has First Amendment right of access to warrant materials after an investigation is concluded or after indictments have been returned." Id. at 1211; In re Baltimore Sun Co. v. Goetz, 886 F.2d 60 (4th Cir.1989) ("we hold that the press does not have a first amendment right of access to an affidavit for a search warrant").
No party, Copley, nor the court's own research has uncovered any authority permitting access to sealed search warrant affidavits or Title III materials prior to a suppression or evidentiary related motion. At the time of oral argument, Copley represented that United States v. White, 855 F.Supp. 13 (D.Mass.1994), strongly supported *1047 its position that there was a qualified First Amendment right of access to the search warrant affidavits and Title III materials. In White the Globe Newspaper Company sought access to an exhibit which was introduced at a suppression hearing. The document at issue contained a transcript of an intercepted conversation pursuant to Title III, 18 U.S.C. §§ 2510-2521. No portion of the suppression hearing, wherein defendant presented and discussed the document in open court, was closed to the public. The district court in White commenced its analysis not with a discussion of whether there existed a historical tradition of public access at a suppression hearing but with the balancing of the privacy and fair trial rights of the intervening defendants. Thus, White, does not support Copley's argument that search warrant affidavits and Title III materials at the present stage in the proceeding are historically open to the public. Copley also argues that access to the materials is required by Waller. However, as previously noted, Waller concerns public access to suppression hearings, an event which has yet to occur.[4]
In sum, historical experience cautions against a finding of public access at this point in time.
The Logic Consideration
The logic consideration seeks to determine "whether public access plays a significant positive role in the functioning of the particular process in question." Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735. The "considerations of experience and logic are, of course, related, for history and experience shape the functioning of governmental processes." Id. at 9, 106 S.Ct. 2735. Here, Copley fails to show how releasing the intercepts or warrant affidavits plays a positive role with respect to the discovery motion (wherein Title III intercepts were submitted to the court) or the present motion for access (wherein the Government submitted the sealed search warrant affidavit).
Copley does not address the logic and experience considerations. Rather, Copley assumes that there is a qualified right of access and proceeds directly to the final step in the analysis  the balancing of factors required to determine whether "closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press Enterprise I, 464 U.S. at 510, 104 S.Ct. 819. This truncated approach, however, is at odds with the analytical framework detailed in Press-Enterprise II. In analyzing the significant positive role public access plays at a preliminary hearing, the Supreme Court in Press-Enterprise II noted that a defendant "has an absolute right to an elaborate preliminary hearing [under California law] before a neutral magistrate." 478 U.S. at 12, 106 S.Ct. 2735. The preliminary hearing affords the defendant the right to appear, to be represented by counsel, to cross-examine hostile witnesses, *1048 to present exculpatory evidence, and to exclude illegally obtained evidence. As noted by this court at the time of oral argument, "in essence the Supreme Court in Press-Enterprise II is saying the preliminary hearing is the evidentiary process in the case; it's the end of the road for most criminal proceedings, for most criminal trials, and that therefore public access is essential to monitor what happens during that process and is the sole occasion in the majority of cases for observation by the public of the proceedings." (RT at 21:13-49).
At the time of oral argument, Copley set forth the following analysis of whether public access to the requested materials plays a significant positive role.
That when the Court gets lodged with it, material in support of a motion, and the Court calendars a hearing on both the substance of the motion and hopefully on whether or not documents can be filed under seal, the government holds the parties to their burden of proof by saying to the Court these documents should be under seal for the following reasons: No. 1, they're wiretap information; No. 2, they're extremely prejudicial  and go through the factors that your Honor just went through in Globe. And if those factors all line up to be more important than the public's right of access, then yes, the public in extraordinarily rare circumstances will not get that material. (RT 20:11-23). First, this argument fails to explain "whether public access plays a significant positive role in the functioning of the particular process in question." Press-Enterprise II, 478 U.S. at 8, 106 S.Ct. 2735. Second, the argument seems to recognize that the materials at issue are considered in relation to "the substance of the motion," an event which has yet to occur in this proceeding. Third, the argument addresses the final step in the analysis: the balancing of public and private interests, and not the threshold issue of access as required by Press-Enterprise II. Fourth, the argument that the public will not receive access only in "extraordinarily rare circumstances" fails to recognize the context of the particular proceeding at issue. For example, as previously discussed, the public will rarely, if ever, have pre-indictment access to search warrant affidavits or grand jury testimony. However, as the proceedings progress and substantive issues are raised, the public will invariably obtain access to search warrant affidavits. Thus, the issue is not whether the public will gain access, but when.[5]
The court readily acknowledges and supports public scrutiny of criminal proceedings as the public plays an important role by serving as a check on possible governmental abuses, by enhancing the quality and integrity of the fact-finding process, and by providing "community therapeutic value." 478 U.S. at 13, 106 S.Ct. 2735. However, until an issue is raised before the court (i.e. by means of a suppression *1049 motion or Title III challenge) public scrutiny does not play a positive role as neither the court nor the public is able to analyze the claims, issues, or evidence required to make an informed judgment. For example, in Press-Enterprise II, the magistrate judge conducted a 41 day preliminary hearing in a widely publicized case where the defendant stood accused of murdering 12 of his patients. At the preliminary hearing the accused had the right to personally appear, to be represented by counsel, to cross-examine hostile witnesses, to present exculpatory evidence, and to exclude illegally obtained evidence. "If the magistrate determines that probable cause exists, the accused is bound over for trial; such a finding leads to a guilty plea in the majority of cases." Id. at 11, 106 S.Ct. 2735. Given the scope of California's preliminary hearings, the Supreme Court concluded that the "preliminary hearings are sufficiently like a trial to justify" public access and provide "the sole occasion for public observation of the criminal justice system." Id. The Supreme Court noted that open access is essential to the proper functioning of the criminal justice system:
The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.
Id. at 13, 106 S.Ct. 2735.
Here, in contrast to the preliminary hearing at issue in Press-Enterprise II, no hearing on any critical stage in the criminal proceeding  such as a suppression hearing, preliminary hearing, or Title III challenge  has yet to occur. Access to the sealed documents at this stage in the proceeding plays no predominate discernable positive role to the functioning of the criminal justice system. Only by means of a suppression challenge does the court or public possess the indispensable context required to assess potential Government abuses and overreaching. In short, Copley's motion is premature. As noted by the Ninth Circuit in language that would seem to apply to both pre-indictment and post-indictment public access to search warrant materials:
We see no justification for opening warrant materials simply because those materials at some point may become the subject of a suppression hearing, which may in turn determine the outcome of a criminal prosecution. The same may be said for evidence presented to a grand jury, yet the public has no right of access to grand jury evidence. While warrant materials may, in due course, be disclosed to a defendant so she can challenge the constitutionality of the search at a suppression hearing to which the public has a First Amendment right of access, it does not follow that the public should necessarily have access to the information before that time.
Times Mirror, 873 F.2d at 1217-18.
In sum, applying the experience and logic considerations the court finds there is no qualified First Amendment right of access that attaches to the Title III materials and search warrant affidavits at this particular stage of the case. Until the public has a First Amendment right of access to these documents, the court need not balance the public and private interests at stake.[6] Copley's motion for access *1050 is denied without prejudice, subject to renewal at a later stage in the proceedings.
IT IS SO ORDERED.
NOTES
[1] The following analysis applies equally to the common law right of access. See Times Mirror, 873 F.2d at 1210 (no common law right of access where there exists neither a history of public access nor important public need).
[2] The court has not reached the discovery motion as Defendants withdrew the motion on December 11, 2003. The Government again submitted copies of the Title III materials as exhibits to its opposition to the instant motion.
[3] Clearly, Title III cannot override a constitutional right. See In re New York Times, 828 F.2d 110, 115 (2d Cir.1987). However, there is no constitutional right to obtain untested and raw intercepts where those issues are not properly before the court.
[4] At the time of oral argument Copley's counsel argued that the discovery motion presented a controversy requiring the court to rule on the motion. The court notes that discovery in this case is on-going and that the court has yet to rule on any discovery motion. Even though Defendants' have filed discovery motions, at this point in time, as represented by the parties, there are no discovery disputes as Defendants, on December 11, 2003 withdrew their discovery requests regarding government misconduct. At oral argument, Copley's counsel also argued that the First Amendment requires the government "to obtain a public hearing and get the Court's ruling that it can actually file materials under seal that it wants the Court to consider in connection with motions or other proceedings that are before the Court before it files them under seal." (RT at 18:8-12). Under this novel theory, there would be no need for sealing any document as each document would be disclosed at a public hearing.
[5] The Government urges the court to adopt the approach taken in United States v. Shenberg, 791 F.Supp. 292 (S.D.Fl.1991). In Shenberg, the media sought access to a search warrant that contained summaries of intercepted communications. The district court concluded that disclosure would "destroy the purpose behind the Title III disclosure limitation." Id. at 293.

The Court cannot ignore the possibility that some or all of the Title III interceptions will be suppressed. Until a suppression hearing is held, or until their admissibility is otherwise established, the Court feels that the privacy interests of the defendants (who let us remember are presumed innocent) and the goal of Title III outweigh the public's interest in present access to the Title III intercepted conversations. After a suppression hearing, or once the admissibility of the intercepted material has been determined, the media are free to renew their motion to unseal.
Id. at 293-94.
[6] The Court notes its concern that any disclosure of the search warrant affidavit prior to a suppression hearing raises the specter of an affidavit so heavily redacted as to create confusion and to mislead the public.